Coos County Probate Court
No. 85-471

## *In re* ESTATE OF HENRY DIONNE

October 3, 1986

*Law Offices of David J. KillKelly*, of Laconia (*David J. KillKelly* on the brief and orally), for Cecile M. Letellier *& a.*, the contestants.

*Bergeron & Hanson*, of Berlin (*Peter H. Bornstein* on the brief and orally), for Virginia Vachon, executrix u/w/o Henry Dionne, the proponent.

*Stephen E. Merrill*, attorney general (*Jeffrey R. Howard*, associate attorney general, on the brief), by brief for the State, as amicus curiae.

*McLane, Graf, Raulerson & Middleton P.A.*, of Manchester (*Jack B. Middleton* and *Judy E. Reardon* on the brief, and *Mr. Middleton* orally), for the ten probate judges, as intervenors.

KING, C.J. The disputants in this will contest case argue that RSA 547:23 (Supp. 1985), which requires the payment of fees to the probate court for special sessions, is unconstitutional, and that because they were required to pay such fees, the proceedings below are null and void. We hold that RSA 547:23 (Supp. 1985) is unconstitutional, vacate the decision below, and remand for new proceedings to be conducted in accordance with this opinion.

RSA 547:23 (Supp. 1985) states:

"Contested and Special Sessions. Whenever the judge, at the request of the parties, shall attend an uncontested hearing, on days other than those fixed by the statute as the legal days for the sitting of the probate court, he may be allowed $20 for his service, plus his expenses. In the case of a contested hearing, he shall be allowed the same per diem compensation for his service as is generally allowed to masters by the superior court plus his reasonable expenses. Such compensation and expenses shall be paid by the party applying for the hearing unless the judge orders otherwise. If the parties are indigent, the court, in its discretion, may assess such charges against the state."

Hence, the probate judges under this statute are permitted $20 in payment for judicial services at special sessions, and when the session involves a contested matter, they are allowed the same per diem compensation as masters, which at the present time is $175 per day. It should be noted that in the instant case the probate judge in the first instance required a payment of the $175 in advance, but later returned to the petitioner all but $20 towards each of the two sessions required in this case.

In addition to the special session fees they collect, the probate judges are paid an annual salary, *see* RSA 491-A:1 (Supp. 1985), for services rendered on a statutorily-set number of "general session" court days, during which they are required to sit. *See* RSA chapter 549. Since June 6, 1986, the annual salary for probate judges has been $19,100. RSA 491-A:1 (Supp. 1985). The number of required general session days varies from county to county, from 52 days per year in Hillsborough County, *see* RSA 549:6, to 11 days in Coos and Grafton Counties, *see* RSA 549:9 and :10. This results in the anomalous situation wherein the probate judge in Coos County is required

to sit in regular session eleven days and receives a pro-rated salary of approximately $1,736 per day, while the judge in Hillsborough receives in effect $360 per day for the 52 days he is required to sit in regular session.[1]

It is clear that the statutorily-set general session days are insufficient to handle all of the matters which need to be dealt with by this State's probate courts. This is borne out by the fact that in calendar year 1985 probate judges received nearly $172,000 in special session fees. Thus, it appears that it has become customary for many of those having business in this State's probate courts to pay for the holding of special sessions.

There is no doubt that the probate courts must be readily available to those citizens who need their services. Nor is there doubt that the probate judges deserve adequate compensation for their work. However, neither of these truths changes the fact that the current method of compensating probate judges for special sessions smacks of the purchase of justice, and is therefore anathema to the New Hampshire Constitution.

The payment scheme set out in RSA 547:23 (Supp. 1985) violates the provision of part I, article 14 of the New Hampshire Constitution which states that:

> "[e]very subject of this state is entitled . . . to obtain right
> and justice freely, without being obliged to purchase it . . . ."

The Magna Carta sealed by King John at Runnymede on June 15, 1215, was the first approach in European history that endeavored to institute political and social reform, and to ensure the birth of a basic form of democracy in Britain. A generalized translation of its contents declared, "To no one will *We* sell, to no one will We deny or delay, right or justice." As we have held, the provision of the New Hampshire Constitution does not prohibit the payment of reasonable

---

[1] Salary and Special and Contested Session Fees by County for Calendar Year 1985

|  | Salary | Fees | Total Compensation |
| --- | --- | --- | --- |
| Belknap | 19,100 | 8,022 | 27,122 |
| Carroll | 19,100 | 7,386 | 26,486 |
| Cheshire | 19,100 | 5,572 | 24,672 |
| Coos | 19,100 | 10,770 | 29,870 |
| Grafton | 19,100 | 23,734 | 42,834 |
| Hillsborough | 19,100 | 32,035 | 51,135 |
| Merrimack | 19,100 | 30,280 | 49,380 |
| Rockingham | 19,100 | 27,366 | 46,466 |
| Strafford | 19,100 | 16,316 | 35,416 |
| Sullivan | 19,100 | 10,280 | 29,380 |
|  |  | $171,761 |  |

filing fees in connection with the filing of cases and appeals in our courts. *See State v. Basinow,* 117 N.H. 176, 178, 371 A.2d 458, 460 (1977) (upholding as constitutional an eight-dollar filing fee for an appeal in superior court). It does, however, forbid the payment of a fee to a judge in consideration of his holding a special session and rendering a judicial decision for a party. *Cf. Christy & Tessier v. Witte,* 126 N.H. 702, 495 A.2d 1291 (1985) (upholding practice of compensating special masters when parties have genuine choice in using such master's services). In an era of heightened sensitivity to appearances of impropriety, the spectacle of a citizen or attorney giving cash in one hand and receiving a judicial hearing and decision in the other is one that can no longer be tolerated. *See* SUP. CT. R. 38—*Code of Judicial Conduct,* Canon 2.

The contemporary injustice to litigants and petitioners having to pay money to a probate judge in consideration for a judicial service to be rendered is compounded by the fact that those citizens whose business is capable of transaction at a regular session of the probate court pay no fee to the judge at all, because his or her judicial services on that day are in return for a portion of the salary which is paid from the public fisc. It must be stressed that this case concerns payments to the judge for judicial services as distinguished from payment of filing or other administrative fees such as those sanctioned in *Basinow supra.* This case presents an issue more akin to the requirement of a fee for a jury trial in a criminal case which this court struck down in *State v. Cushing,* 119 N.H. 147, 399 A.2d 297 (1979).

The legislature to date has determined that the probate affairs of our citizenry can be accommodated by a part-time court where the judges may engage in private law practice or other private sector pursuits as distinguished from the full-time judges of this court, the superior court, and the full-time district courts who are precluded by law and canons of judicial conduct from most private sector endeavors. The part-time aspect of the probate courts makes judicial remuneration a difficult task for the legislature. Apparently, the legislature has conceded the fact that the probate judges' salaries are inadequate; otherwise, there would be no need for fee-supported supplements to such salaries to be paid by citizens directly to the judge if their business is not susceptible of consideration at a regular session. In fact the legislature in the 1983 session increased the fees by 100% by an increase from $10 to $20 per special session. A fair reading of part I, article 14 of the constitution in modern times tells us that the system under attack is flawed in a constitutional context. The line so carefully drawn by our brother Souter in his dissent has in fact been crossed.

As a now retired Rockingham County Probate Judge, William W. Treat, stated in his introduction to the 1980 biennial report of the New Hampshire Judicial Council:

> "[T]here still lingers a so-called special session fee in our Probate Courts which is paid by litigants who choose to have matters heard on days other than on regular session days. While this system has survived with remarkably few complaints, it is inconsistent with a professional judiciary. It is no longer tolerable in a modern court system where court costs are paid out of general funds. The New Hampshire court system cannot be considered as having joined the twentieth century until the fee system has been totally abolished."

N.H. JUDICIAL COUNCIL, EIGHTEENTH BIENNIAL REPORT 3 (1980).

Additionally, we think that RSA 547:23 (Supp. 1985) violates the spirit, though not the letter, of the provision of part I, article 35 which states:

> "It is therefore not only the best policy, but for the security of the rights of the people, that the judges of the supreme (or superior) judicial court should . . . have honorable salaries, ascertained and established by standing laws."

The same concern for "an impartial interpretation of the laws, and administration of justice," N.H. CONST. pt. I, art. 35, which led the framers to call for "honorable salaries, ascertained and established by standing laws," for the judges of this court and the superior court, applies equally to the other courts of this State and the judges who serve in them.

We hold, therefore, that in this case and in every case requiring a special session in the probate court after today, the probate court may not require the payment of fees for special sessions under RSA 547:23 (Supp. 1985). We find that the unconstitutionally-required payment in this case tainted the proceedings in this case, vacate the decision below and remand for new proceedings consistent with this opinion. In light of our constitutional holding, we need not consider the other issues raised on appeal.

The legislature at the session which will begin within 90 days will undoubtedly be called upon to fill the void in the remuneration for probate judges created by this decision. The probate court is an integral and important part of New Hampshire's judiciary performing highly specialized and important tasks for which it is peculiarly suited and adapted, involving such things as the administration of

estates of deceased or impaired persons, as well as passing upon involuntary commitments to the New Hampshire Hospital. Any diminution in remuneration sustained by the probate judges during the intervening period from the date of this decision to legislative action is properly a matter for consideration by the legislature in making any salary adjustment. Because diminution of judicial salaries is constitutionally suspect and undoubtedly violative of the contract clause of the United States Constitution, we deal in this case only with fees collected by the probate judiciary for judicial services and not in any way with their pre-existing salary scheme. *See Jeannont v. N.H. Personnel Comm'n*, 118 N.H. 597, 392 A.2d 1193 (1978).

The fact that the unconstitutional arrangement embodied in RSA 547:23 has perpetuated itself for almost 100 years is attributable solely to the fact that this is the first case in which its constitutionality has been challenged in this court. That we now have the opportunity to decide its constitutionality results only from the fact that counsel in this case pursued his client's cause with a vigor that is a credit to attorneys generally.

*Vacated; remanded.*

SOUTER, J., dissented; the others concurred.

SOUTER, J., dissenting: In considering the contestants' challenge to RSA 547:23 (Supp. 1985) the majority opinion discusses two distinct issues. It evaluates the merits of the statutory policy of providing for special and contested session fees to supplement probate judges' salaries, and it holds that policy to be repugnant to part I, article 14 of the Constitution of New Hampshire, guaranteeing the "right to obtain right and justice freely, without being obliged to purchase it."

Although I do not believe that the merits of the statutory policy are subject to our review, I agree nevertheless with the court's disapproval of the fee system in question; the majority opinion is, if anything, moderate in its condemnation. If, therefore, that system were subject to the regulation of the judicial branch in accordance with its own notions of good public policy, I would join with the court in bringing the system to an end. *See Christy & Tessier v. Witte*, 126 N.H. 702, 459 A.2d 1291 (1985). But because the fee system is a creature of statute, the only issue before us is the system's constitutionality, and for the reasons that follow I respectfully dissent from the court's holding that the statute violates article 14.

It is well to note at the outset that the contestants make no claim that the statutory obligation to pay fees has denied them access to the court. Their position is, rather, that the obligation to pay any fee

to a judge of probate is a requirement to "purchase" right and justice and is therefore unconstitutional per se. However attractive we may find this position, it is wrong as a matter of constitutional law.

This conclusion follows virtually of necessity once we apply this court's clear rule that "the language of the Constitution is to be understood in the sense in which it was used at the time of its adoption (*Opinion of the Justices*, 41 N.H. 551 [declaring that Constitution requires a jury of twelve])." *Opinion of Justices*, 44 N.H. 633, 635 (1863). We confirmed the vitality of this interpretive principle as recently as five years ago in *Opinion of the Justices*, 121 N.H. 480, 483, 431 A.2d 135, 136 (1981), and it is just as applicable today in the construction of article 14 as it was in that recent case, construing the article 15 right to jury trial. The court's interpretive task is therefore to determine the meaning of the article 14 language as it was understood when the framers proposed it and the people ratified it as part of the original constitutional text that took effect in June of 1784. *See* 20 EARLY STATE PAPERS OF NEW HAMPSHIRE 11, 31 (A. Batchellor ed. 1891).

Evidence of that understanding comes from two sources. The first is the body of scholarly and judicial commentary on the meaning of the clause of the Magna Carta of 1215 by which the King promised that he would no longer sell right or justice, "Nulli vendemus . . . rectum aut justiciam." *Perce v. Hallett*, 13 R.I. 363, 365 (1881). It is from this clause that the relevant language of article 14, and its counterparts in a majority of other States, is derived, *see State v. Basinow*, 117 N.H. 176, 177, 371 A.2d 458, 459 (1977), and the accepted interpretation of the Magna Carta language is therefore one good indication of the meaning intended by the eighteenth century framers, as we have previously held. *Id.*

A number of courts in addition to our own have explained the Magna Carta language, and a few examples will illustrate the interpretative consensus. The Supreme Court of Minnesota, for example, observed that "[t]he constitutional right to obtain justice freely and without purchase, which is as ancient as *magna charta*, has not been understood to be a right to have judicial proceedings carried on without expense to the parties." *State v. Gorman*, 40 Minn. 232, 233, 41 N.W. 948, 949 (1889) (citations omitted). Rather, the constitutional language as "borrowed from Magna Charta . . . was designed to abolish, not fixed fees, prescribed for the purposes of revenue, but the fines which were anciently paid to expedite or delay law proceedings and procure favor." *Perce v. Hallett, supra* at 364, *quoted with approval in State v. Basinow, supra* at 178, 371 A.2d at 459. Winfield has described the early medieval demand for these latter payments as "the evil practice of the Anglo-Norman

kings in extorting money for the administration or retardation of justice," P. WINFIELD, THE CHIEF SOURCES OF ENGLISH LEGAL HISTORY 138 (1925), and the Supreme Court of Tennessee accordingly understood that "it was official plunder, not taxation" of fees which gave birth to the provision in question. *Harrison, Pepper & Co. v. Willis,* 54 Tenn. (7 Heisk.) 35, 49 (1871). Hence, the point of the 1215 language, and of the modern constitutional commands derived from it, is that "the judges . . . must issue the proper judicial process without fee or reward, except that fixed by law," *id.* at 46. This court reached the same conclusion less than ten years ago when it accepted the historical explanation that article 14 was intended to forbid bribery, not the imposition of fees and costs. *State v. Basinow, supra* at 178, 371 A.2d 460. *But see State v. Cushing,* 119 N.H. 147, 148, 399 A.2d 297, 298 (1979) (article 14 cited together with article 15 in declaring entry fee in appeals for criminal jury trial unconstitutional).

The result of reading the constitutional guarantee of free justice in the light of such historical explanation has been, at least in civil cases like *Basinow,* to sustain the constitutionality of administrative fees imposed by statute or rule of court. It is true that *Basinow* and most of the cases on free justice have dealt with fees payable to the court to defray office expenses or the like, and not with fees payable to judges as supplementary compensation. But for all that one may dwell upon the different psychological implications of the two types of fees, the distinction between them makes no difference in the light of the history that this and other courts have recognized. Special and contested session fees are set by statute, and to analogize them to judicial bribery would simply stretch the point unreasonably. Therefore the historical analysis of the source of the article 14 language indicates that payment of the RSA 547:23 (Supp. 1985) fees is not a purchase, or a denial of free right or justice, as forbidden by article 14.

The second source of evidence bearing on the framers' understanding is the history of New Hampshire statutes providing not only for probate fees, but specifically for fees in lieu of probate judges' salaries or as supplements to such salaries. This history is worth pausing over, as a record of what New Hampshire judges and legislators regarded as consistent with English liberties during the early period of our history, and as consistent with the State Constitution after 1784.

While the pre-constitutional period has only marginal importance here, what little we know of the very early years suggests that fees for judicial salaries were not thought to violate the spirit of Magna Carta. Justice Page has described an early bill of costs allowed in

the unreported 1663 New Hampshire case of *Cogswell v. Rawlins*; in addition to the losing party's obligation to pay what we would call entry and witness fees, reporter's expenses and the like, he was taxed a further shilling as the judge's fee. E. L. PAGE, JUDICIAL BEGINNINGS IN NEW HAMPSHIRE 76 (1959).

The story is the same when we skip ahead to the modern constitutional period, which began when article 14 took effect in June of 1784. During the period in which the constitution was considered and ratified, judicial fees were regulated by the act of September 1, 1781, 4 N.H. Laws 420, which in turn had reenacted the fee schedules contained in an earlier statute of March 12, 1768, 3 N.H. Laws 486. The statute of 1768 contained several provisions for fees payable to justices for attendance at proceedings, some of them payable from the treasury, *id.* at 488, and some not, *id.* at 487. The example directly in point here is a provision for a six-shilling fee for attending a dispute in any probate case, payable as a cost of litigation, to be divided equally between the judge and the register of probate. *Id.* at 492. This appears to authorize a judicial fee for attendance at a contested hearing and is thus the recognizable predecessor of RSA 547:23 (Supp. 1985).

It is therefore fair to say that many of the same legislators who proposed the adoption of article 14 understood its provision to be consistent with probate fees payable as judicial compensation. Nor is there any indication, so far as I am aware, of any quick second thoughts on the subject. An act of February 9, 1791, 5 N.H. Laws 613, contained a provision identical to the one just discussed, and the system of such fees endured through the period covered by the act of December 23, 1820, 8 N.H. Laws 1003, by which time a probate judge's fee for attendance at the hearing on a disputed case was set at fifty cents.

The fee system for probate judges' compensation came temporarily to an end by the act of July 26, 1826, which provided for salaries as full compensation, 9 N.H. Laws 533, but judicial attendance fees reappeared half a century later in the predecessor to the modern statute, setting a fee of five dollars a day for attendance at a contested hearing. Laws 1878, 33:1. Since that time, the existing fee system has persisted without interruption until today.

Indeed, in the time available for our research on this case, I have found only one hint in the entire period of statutory history that even suggests that article 14 could be read to prohibit the fees in question. The suggestion, never tested, occurred in the title of Laws of 1881, ch. 94, said to be in "furtherance" of article 14, by providing that fees of referees in cases referred to them by order of the court would be payable by the county. *See Dodge v. Stickney*, 61 N.H. 607,

610 (1882). If such was the legislative assumption, it was certainly applied selectively, for in 1881, G.L. 189:16 provided probate judges with contested session fees, just as RSA 547:23 (Supp. 1985) provides for them today.

While no statutory history is ever conclusive on an issue of constitutional meaning, the long and unbroken statutory sequence before us in this case is highly persuasive evidence of what the people of 1784, and their successors to the present day, understood by the language of article 14. Since the adoption of that article was not followed by any known challenge to the statutory provision for fees to compensate probate judges, the most reasonable inference is that the constitutionalists of that time did not understand the fee provision to be a forbidden obligation to purchase justice.

This consistency of statutory history with the accepted interpretation of the original Magna Carta provision demonstrates beyond any serious doubt that the people who framed and adopted article 14 meant principally to guard against bribery of the sort that had corrupted the early medieval judiciary. They did not mean to outlaw all statutory fees related to judicial services. Given the historical canon for interpreting substantive constitutional guarantees, long since adopted by this court and frequently affirmed, it follows that the majority are mistaken in applying article 14 today to invalidate RSA 547:23 (Supp. 1985).

"Upon this point a page of history is worth a volume of logic." *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921) (Holmes, J.). I respectfully dissent.