666 A.2d 1246

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Richard Allen JAMES.**

**No. 21, Sept. Term, 1992.**

Court of Appeals of Maryland.

Nov. 9, 1995.

---

Melvin Hirshman, Bar Counsel, and Glenn M. Grossman, Assistant Bar Counsel, for the Attorney Grievance Commission of Maryland, Petitioner.

Ralph W. Powers, Jr., Upper Marlboro, for Respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

This opinion addresses a suspended attorney's non-compliance with the order of suspension. In *Attorney Grievance Comm'n v. James,* 333 Md. 174, 634 A.2d 48 (1993) (*James II*), we suspended Richard Allen James (James) for one year. This continuation of *James II* arises under Maryland Rule BV13.a.2. That rule in relevant part provides that

"[u]pon expiration of the period of suspension specified in the order, the Clerk of the Court of Appeals shall replace the name of the attorney upon the register of attorneys in that Court, and the attorney may practice law, only after (a) the attorney files with the Bar Counsel a verified statement that the attorney has complied in all respects with the terms of the suspension and (b) Bar Counsel notifies the Clerk that the statement has been filed and Bar Counsel is satisfied that the attorney has complied with the terms of the suspension."

The effective date of James's suspension was January 12, 1994. Shortly prior to January 12, 1995, James filed an affidavit with Bar Counsel declaring that he "ha[d] complied in all respects with the terms of the suspension." On January 9, 1995 Bar Counsel dispatched one of that office's investigators to 7500 Greenway Center Drive, Suite 110, Maryland Trade Center, Greenbelt, Maryland, the address of James's principal office for the practice of law in this State during the proceedings leading to his suspension. That office building's directory listed under the letter "J" the name "James, Richard Allen, Attorney at Law, 110." The investigator returned to the building "several times" between January 9 and February 6. On each occasion the building directory listing for James remained unchanged.

On January 18, 1995 Bar Counsel filed with this Court James's affidavit together with Bar Counsel's response, averring in part that James "has violated the terms of his suspen-

sion by engaging in the practice of law during the period of this suspension." This Court, by order of February 6, 1995, referred the matter to Judge Graydon S. McKee, III of the Circuit Court for Prince George's County to conduct an evidentiary hearing, to make appropriate findings, and to refer the matter back to this Court for our further consideration.

The investigator returned to the office building in Greenbelt on March 1, 1995 to find that the directory listing for James as an attorney-at-law had been removed. Further, the name of Eugene M. Brennan, Jr. (Brennan) had been newly listed as an attorney-at-law who could be found in Suite 110.

The hearing before Judge McKee was held on March 9. James maintained, in essence, that the law practice conducted out of Suite 110 was Brennan's, and that he, James, merely acted as Brennan's law clerk or paralegal. Judge McKee found that a "combination of public appearance and internal operating procedure created an atmosphere where [James] continued to effectively hold himself out as a practicing attorney." Judge McKee concluded that James's "actions while on suspension constituted 'practicing law' under any reasonable interpretation." The matter is now before this Court on James's exceptions to Judge McKee's findings of fact, made as a hearing master for this Court.

James was admitted to the bar of this Court in 1971. At all relevant times he had neither any partner nor associate attorney.[1] Brennan was admitted in 1980. He gave up the practice of law in 1984 or 1985 in order to pursue a career in commercial real estate. In about 1990 or 1991, when "the bottom fell out of" that market, he resumed practicing law from his home in Glen Burnie. In 1993 he opened an office on State Circle in Annapolis, practicing alone and doing his own secretarial work.

James's suspension that became effective January 12, 1994 was announced by the opinion filed December 13, 1993.

---

1. For some years prior to May or June 1994, another attorney conducted a practice, independent of James's practice, out of Suite 110. That attorney and James shared certain expenses.

*James II,* 333 Md. at 174, 634 A.2d at 48. In late 1993 James discussed with Brennan James's preparations for the suspension. James asked Brennan to come to the Greenbelt office. James told Brennan that James "wanted to, if possible, keep that office open." James gave Brennan the impression that James's practice was a good one. James wanted Brennan basically "to take over Mr. James's clients...." James "said that [Brennan] could probably, if things worked out well, maybe expect a possible $100,000 year."

Before describing in Part II, *infra,* how the James–Brennan arrangement actually operated, we shall review the guideposts in Maryland that were available to James concerning law-practice-related activity by a suspended attorney. Initially we note that, prior to the suspension now under consideration, James had been suspended for two years by the District of Columbia Court of Appeals, *Matter of James,* 452 A.2d 163 (D.C.App.1982). Based on the same misconduct, this Court suspended James from practice in this State for two years beginning in August 1984. *Attorney Grievance Comm'n v. James,* 300 Md. 297, 477 A.2d 1185 (1984) *(James I).* Thus, James previously had been obliged to reflect upon the restraints on law-practice-related activity imposed by a suspension.[2]

I

■ An "attorney may not practice law ... during the period the attorney, by order, is suspended." Rule BV13.a.2.

---

2. The 1984 suspension was for a commingling of a client's funds that did not rise to the level of a misappropriation. In *James I,* 300 Md. at 305, 477 A.2d at 1189, we quoted from the District of Columbia Court of Appeals Board on Professional Responsibility, *Report and Recommendation* at 21–22 (July 17, 1981), in part as follows:

" '[B]ased upon the commingling alone, we would probably recommend a suspension of approximately one year. In our view, however, [James] seriously compounded his wrongdoing by the evasions and misrepresentations he engaged in with the court and his client in an apparent effort to escape from the problems he had created for himself.' "

One definition of "practice law" is found in Md.Code (1989, 1995 Repl.Vol.), § 10-101(h)(1) of the Business Occupations and Professions Article (BOP). It reads:

"(1) 'Practice law' means to engage in any of the following activities:

(i) giving legal advice;

(ii) representing another person before a unit of the State government or of a political subdivision; or

(iii) performing any other service that the Court of Appeals defines as practicing law.

(2) 'Practice law' includes:

(i) advising in the administration of probate of estates of decedents in an orphans' court of the State;

(ii) preparing an instrument that affects title to real estate;

(iii) preparing or helping in the preparation of any form or document that is filed in a court or affects a case that is or may be filed in a court; or

(iv) giving advice about a case that is or may be filed in a court."

The foregoing general prohibitions are complemented by BOP § 10-601(b), setting forth expressly permitted activity. That statute provides in relevant part:

"[W]hile the individual's right to practice law is suspended or revoked, the individual may:

(1) discharge existing obligations;

(2) collect and distribute accounts receivable; or

(3) perform any other act that is necessary to conclude the affairs of a law practice but that does not constitute practicing law."

BOP § 10-601(a), in combination with § 10-101(b), generally prohibits an individual from practicing law in this State without authorization by the Court of Appeals. "It is not a defense to a charge of a violation of [BOP § 10-601] that the defendant acted through an officer, director, partner, trustee, agent, or employee who is a lawyer." BOP § 10-601(c).

Ultimately, this Court decides what is the practice of law. *See Public Serv. Comm'n v. Hahn Transp., Inc.,* 253 Md. 571, 583, 253 A.2d 845, 852 (1969); *Lukas v. Bar Ass'n of Montgomery County, Inc.,* 35 Md.App. 442, 447, 371 A.2d 669, 672 (1977). We have said that the practice of law includes "[u]tilizing legal education, training, and experience [to apply] the special analysis of the profession to a client's problem." *Kennedy v. Bar Ass'n of Montgomery County, Inc.,* 316 Md. 646, 662, 561 A.2d 200, 208 (1989). Depending on the circumstances, meeting with prospective clients may also constitute the practice of law because "the very acts of interview, analysis and explanation of legal rights constitute practicing law in Maryland." *Id.* at 666, 561 A.2d at 210.

Work as a paralegal has been involved, in different degrees, in two decisions of this Court. In one decision an attorney applied for reinstatement after having been disbarred for twelve years. *Matter of Murray,* 316 Md. 303, 558 A.2d 710 (1989). Prior to his disbarment, Murray had practiced as a partner in a firm in Baltimore County. After his disbarment, Murray sold his home in Baltimore County and moved to Carroll County where he was employed as a paralegal, during the period of his disbarment, by an established Westminster firm. *Id.* at 306 & n. 1, 311, 558 A.2d at 711 & n. 1, 713. We simply included these facts without comment among those set forth in an opinion readmitting Murray.

The second case, *Matter of R.G.S.,* 312 Md. 626, 541 A.2d 977 (1988), arose on an application for admission upon completion of the abbreviated examination for attorneys previously admitted in another state. R.G.S. was a member of the North Carolina bar who had practiced there for five years. He came to Maryland to become a full-time professor of law. Some fourteen years later he reduced his teaching schedule to that of a part-time, adjunct faculty instructor in order to be employed full time as counsel to an established law firm in Anne Arundel County. *Id.* at 628, 541 A.2d at 978. There he drafted pleadings, supporting memoranda, and briefs, under the supervision of licensed Maryland lawyers. *Id.* at 632, 541 A.2d at 981. He advised the partners in the firm on litigation

strategy and the like. *Id.* at 632–33, 541 A.2d at 981. One issue presented to us was whether this activity was the unauthorized practice of law or whether it could be credited toward the experience requirement under the applicable admission rule, Rule 14.

In that context, we said:

"The goal of the unauthorized practice statute is achieved, in general, by emphasizing the insulation of the unlicensed person from the public and from tribunals such as courts and certain administrative agencies. The Rule 14 goal is achieved by looking at the actual significance of the legal work that the applicant proffers to show compliance with the 'practice of law' requirement. In this case, significant legal work was performed by one already admitted to practice by examination in another state. That work was performed in a way that insulated the practitioner from direct contact with lay clients and the courts and administrative tribunals. The work also was done under the supervision of a licensed Maryland lawyer. Under these circumstances, that work may be actual practice within the meaning of Rule 14, but not unauthorized practice within the meaning of [BOP § 10–601(a) ]."

*Id.* at 638–39, 541 A.2d at 983 (citation omitted).

Here, James contends that, like R.G.S., his activities do not constitute unauthorized practice in violation of the suspension order because they were conducted under the supervision of Brennan. Other guideposts in Maryland, however, bear on James's arrangement with Brennan.

Rule 5.5 of the Maryland Lawyers' Rules of Professional Conduct states in part that a lawyer shall not "[a]ssist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law." Md. Rule 5.5(b). The Maryland State Bar Association Committee on Ethics, in Informal Opinion Docket 79–41, had occasion to consider whether a sole practitioner should hire, as a paralegal, a former associate attorney who had been disbarred. The Committee assumed that the employment was

not illegal, and it limited its opinion to the effect on the question of the predecessor to Rule 5.5(b). We quote liberally from the Committee's opinion, not because we are here directly concerned with Brennan's conduct, but because the opinion reflects the difficult position in which James placed himself by the James–Brennan relationship, and particularly as it bears on the affidavit required by BV13.a.2.

"[T]he attorney should not hire the applicant if, in any given locality the public will be given the impression that disbarment was ineffectual or has been ignored. Under the facts which you presented, this would be a serious impediment to the hiring of this individual. Because of the presence of his former clients and his former association with you, the public may be led to believe that the disbarment has made no difference. The arrangement would give to the public the appearance of impropriety.

"The employer must be scrupulously careful about compensation of this particular individual as well as his supervision of the duties and work product of the individual within the law office. In compensation, it would be clearly impermissible to share fees under DR 3–102 but any arrangement, salary or otherwise, based on, or calculated from the fees of clients or otherwise tantamount to a draw, would be equally impermissible as long as it suggested that the title of paralegal or clerk merely covered up what was, in substance, a continuation of the practice of law.

"The employer-attorney may have a duty to disclose the status of the individual to clients before allowing him to work on matters for the clients but this requirement may conflict with the prohibition against giving to the public the appearance of impropriety and there may be no safe or satisfactory way for the attorney to resolve this conflict.

"The Committee is aware that this list is not exhaustive and there may be any number of situations arising every day which would test the propriety of the relationship.

"As we have stated, however, we do not believe that the fact of disbarment should, in all cases, preclude the former attorney from obtaining employment as a clerk or paralegal.

Where it is permissible, it may even be commendable for a lawyer or lawyers to assist in the rehabilitation of a former colleague. But these considerations must never override the attorney's duty to his or her client, the public, and the legal profession.

"Under your fact situation, the Committee is of the opinion that your relationship, and that of your clients and the public in your locality with the former attorney is too close, and too filled with potential problems, to be professionally proper and therefore this Committee is of the opinion that to hire the previously disbarred attorney as a paralegal in your office under these circumstances would not be ethical."

Informal Docket 79–41 at 3–4.

Further, the order suspending James, BOP § 10–601(a), and Rule BV13.a.2 terminated continued ethical representation by James of his existing clients.[3] Thus, Professional Conduct Rule 1.16(d) became operative. It reads in relevant part:

"Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advanced payment of fee that has not been earned."

Consequently, James was ethically obliged to notify his clients of his withdrawal from their representation. Selection of substitute counsel was ultimately the decision of the respective clients. Many of the matters that James was handling were contingent fee cases. Professional Conduct Rule 1.5(c) requires that "[t]he terms of a contingent fee agreement shall be communicated to the client in writing." Accordingly, in

---

**3.** Professional Conduct Rule 1.16(a)(1) provides in relevant part that "where representation has commenced, [a lawyer] shall withdraw from the representation of a client if ... the representation will result in violation of the Rules of Professional Conduct or other law."

instances where James's former clients decided to engage Brennan under a contingent fee agreement, Brennan was ethically obliged to "enter into a new fee agreement with each client which conform[ed] to the requirements of Rule 1.5 and which [was] based on the services which [Brennan would] perform for the client." Maryland State Bar Association Committee on Ethics, Docket 90–31 at 4.[4]

 Finally, Rule BV13.a.2 alerted James when his suspension became effective that it would not terminate automatically upon the expiration of one year. Reinstatement to practice, following suspension for a stated period, is subject to two conditions, first, the filing of a verified statement by the suspended attorney that the attorney has complied in all respects with the terms of suspension, and second, the notification by Bar Counsel to this Court that Bar Counsel is satisfied that there has been compliance with the terms of the suspension. This second condition was added to Rule BV13 effective January 1, 1987. 13 Md.Reg. 1016–17 (1986). The amendment effectively makes indefinite the duration of a suspension, initially imposed for a stated period, where compliance with the terms of the suspension becomes a contested issue. Under the structure of Rule BV13.a.2 the burden is on the attorney seeking to resume practice to satisfy the trier of fact that the condition precedent of compliance with the terms of the suspension has been met.

## II

In this Part II we review the evidence of post-suspension activity in order to determine whether Judge McKee was clearly erroneous when he found that James had not complied with the suspension.

James remained in Suite 110 for which he was obligated by a lease. Suite 110 is an area of approximately 732 square feet

---

4. Our citation to Maryland State Bar Association Committee on Ethics, Docket 90–31, is not intended to indicate any opinion of this Court on matters contained in that opinion other than our approval of the rule that is quoted above.

on the first floor of the office building immediately within the main entrance. Brennan initially worked out of both the Greenbelt and Annapolis offices, and he did not close the latter until May 1994. This roughly coincides with the departure from Suite 110 of an attorney who had been sharing office space and expenses with James.

James caused the Greenbelt building manager to replace the brass plate that had been affixed to the building corridor wall next to the door into Suite 110. The removed plate read "Law Offices," below which were set forth the names of both James and the attorney with whom he shared space. The substitute plate read simply "Law Office." The building manager testified that she was not requested to change the building directory listing. She was not aware that James had been suspended.

James had placed a full page (6¾″ × 11″) ad in a community telephone book, seeking plaintiffs' personal injury cases and criminal defense work. He cancelled further publication of that ad. James did not, however, cause his Bell Atlantic telephone directory listings to be changed. In the Bell Atlantic business directory published for use in the period October 1994 through September 1995, James was listed in the classified, or yellow pages, section under "Lawyers." In the alphabetical, or white pages, section of the same directory, he was described in bold type as an attorney. In a competing telephone directory, *The Suburban One Book,* published for use in 1994–1995, James was described as an attorney in the alphabetical, white pages and listed with lawyers in the yellow, classified pages. Neither of these directories listed Brennan at all, although he was supposed to have had an office for the practice of law in Greenbelt since January 1994.

Brennan acknowledges that he had no written fee agreements with former clients of James whom Brennan represented on a contingent fee basis. James testified that he thought that he had notified most of his personal injury clients that he would no longer be handling their cases, but no illustrative sample of such a notice was put in evidence by James. The

only notification in evidence was a letter from James to a liability insurer advising that Brennan, of the Greenbelt address, thereafter would be handling the particular client's case.

With respect to cases pending in court in which James had entered his appearance as counsel, it seems, from a limited number of illustrations in the record, that James did not strike his appearance, but that Brennan did enter his appearance. A limited sampling of docket entries indicates that, thereafter, notices from the court were sent to Brennan and not to both James and Brennan.

Prior to the suspension two legal secretaries had been employed part time in Suite 110. One of them, Debby Pence (Pence) was called as a witness by Bar Counsel. Pence had been James's secretary since 1990, and she continued after the suspension as secretary for Brennan and James. From January to June, Brennan did not pay the salary and salary expenses of the secretaries. During that period Brennan "would contribute as able toward the utilities." James also paid the telephone bill for the number listed to James as an attorney-at-law in the Bell Atlantic and the Suburban One directories. Brennan testified that, after June, he was the only person paying secretaries in the office. As of the hearing, Brennan had not yet furnished an IRS form W–2 to Pence, but he planned to do so.

Nor did Brennan furnish an IRS form W–2 or an IRS form 1099 to James reporting the compensation from Brennan to James for James's work for Brennan in the year 1994. Brennan and James have no written contract concerning the compensation to be paid by Brennan to James for James's paralegal services. James did not bill Brennan for time devoted by James, after his suspension, in working for Brennan on cases of James's former clients.

Pence further testified that she was instructed to answer the telephone, "law offices." She was instructed to refer all *new* clients to Brennan. If the call were for James, Pence was instructed to take a message, whether James was there or not.

James customarily dictated on tape. When Pence had typed the dictation, she would place the written material on Brennan's desk. She "assume[s] he saw them."

Bar Counsel also introduced numerous papers filed in court that were signed in Brennan's name but which Brennan admitted were actually signed by James. In general, Brennan took the position that he had seen prior drafts of the papers and had authorized James to sign for him. Some of the papers were affidavits of service which Pence notarized as Brennan's affidavit, when the affidavits were in fact signed by James in Brennan's name. Pence said, "It was just normal procedure in the office that it came back to my desk with a signature on it, and I would sign the affidavit."

James had filed suit in 1991 on the personal injury claim of his client, Santina Romano. The case was settled in February 1995. Apparently because James had not stricken his appearance, the stipulation of dismissal that was prepared by the attorney for the defendant contained separate signature lines for James and for Brennan, identifying each as attorney for the plaintiff. James signed that stipulation of dismissal in his own name. James also signed Brennan's name on the dismissal, without indicating by initials that Brennan had not personally signed. The dismissal was filed in the Circuit Court for Prince George's County. Brennan testified that, during 1994, James's work on the Romano file included meetings, at which Brennan was present, with the client, with the client's son, and with an expert. Brennan testified that James "presented me with a bill for services [on Romano's case], and as to whether or not that addressed work in '94 I don't know." No bill was introduced.

Another pre-suspension, personal injury case client of James was Margaret Orimogunje (Orimogunje). In April 1994 James prepared an amended complaint in Orimogunje's action and, after signing Brennan's name to it, filed it in court. Brennan testified that he had reviewed the pleading and authorized James to sign it for him. The liability insurer for the defendant in the Orimogunje case was Pennsylvania Na-

tional Mutual Casualty Insurance Company. Bar Counsel called as witnesses three former claims representatives of that insurer, and Bar Counsel placed in evidence much of the insurer's file on the Orimogunje claim, including the claim activity log. The log reflects that the insurer's representatives had negotiations with James in a telephone conversation in February and in a number of telephone conversations in May 1994. One of the adjusters testified that in the February call James and she engaged in a series of offers and counteroffers. Another testified that he had offered $1,000 in a conversation with James. That adjuster testified that James "refused that, and he indicated that he would recommend $3,500 to his client."

Judge McKee synthesized his findings in the following paragraph:

"This Court notes the distinction between the internal operations of Respondent's office and the external, public appearance of the office. To the public, it could reasonably have appeared that Respondent continued to practice law. For example, a person seeking legal assistance could call the same phone number, and the call would be answered, 'Law Office.' When the potential client arrived at the building, Respondent's listing in the building directory remained the same, the sign immediately outside the office said 'Law Office,' and Respondent might meet with the potential client. With regard to the internal workings of the office, Respondent continued to draft legal documents, negotiate on behalf of clients, and even sign legal documents. This combination of public appearance and internal operating procedure created an atmosphere where Respondent continued to effectively hold himself out as a practicing attorney."

The approach taken by James in his exceptions undertakes to isolate specific activities and then to explain the activity either on the ground that it was undertaken under the supervision of Brennan or that it constituted a mere inadvertence. Based on the total record Judge McKee was free to reject the contention that Brennan was the supervising attorney and

James was the paralegal. Further, Judge McKee stated that he was "thoroughly convinced by the evidence that [James's] violations were not inadvertent" and that it was "disingenuous to suggest" that they were.

Judge McKee's finding that James continued in the practice of law during his suspension is not clearly erroneous.[5]

### III

Inasmuch as James never served the one year suspension imposed in *James II* we order that James serve the suspension of one year for the violations that he committed, as determined in *James II*, beginning three days after the filing of this opinion and its transmittal, by ordinary mail, by the Clerk of this Court to the attorney for James in these proceedings.

Our disposition deals only with the sanction imposed for the misconduct in *James II*. Whether any disciplinary proceedings should be undertaken concerning the activities of James, or of any other or others, during the time when James should have honored the order of suspension filed in *James II* is a matter for Bar Counsel to determine in the first instance.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION OF MARYLAND AGAINST RICHARD ALLEN JAMES.*

---

5. For that reason, we need not in this case rest our decision on the failure to meet the burden of proof that is placed by Rule BV13.a.2 on a suspended attorney to prove compliance with the terms of a suspension that is imposed for a stated period.