681 A.2d 510

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

**v.**

**Morgan Joseph HALLMON.**

**Misc. (Subtitle BV), No. 13, Sept. Term, 1995.**

Court of Appeals of Maryland.

Aug. 28, 1996.

392

Melvin Hirshman, Bar Counsel, and John C. Broderick, Assistant Bar Counsel, for Petitioner.

Morgan Joseph Hallmon, Mitchellville, pro se.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

The respondent, Morgan Joseph Hallmon (Hallmon), has been found to have assisted an unlicensed person in the unauthorized practice of law in violation of the Maryland Lawyers' Rules of Professional Conduct, Rule 5.5(b).[1] That violation involved a hearing before a Zoning Hearing Officer for Prince George's County. Investigation of that complaint led to further charges and findings of violations, namely, failure to respond to a demand for information by Bar Counsel in violation of Rule 8.1(b),[2] and failing to maintain an escrow

---

1. Maryland Lawyers' Rules of Professional Conduct, Rule 5.5 in relevant part reads:

 "A lawyer shall not:

 . . . .

 (b) assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law."

 In this opinion all references to a "Rule" are to the Maryland Lawyers' Rules of Professional Conduct.

2. Rule 8.1 in relevant part provides:

 "[A] lawyer . . . in connection with a disciplinary matter, shall not:

account in violation of various requirements, including Maryland Code (1989, 1995 Repl.Vol.), §§ 10–302, 10–304 and 10–307 of the Business Occupations and Professions Article (BOP).[3]

Hallmon was admitted to the District of Columbia bar in 1989 and to the bar of this Court in 1990. For approximately eighteen months ending in December 1990 Hallmon was employed as counsel for a non-profit organization in the District of Columbia. During that employment Hallmon had met W. Eric Cloud, an attorney admitted in the District of Columbia and in Pennsylvania. Eric Cloud practiced law under the apparent firm name of Cloud & Henderson.[4] Eric Cloud's legal stationery lists an address in Largo, Maryland as his principal office for the practice of law. In the right-hand margin that stationery also shows an address on Bladensburg Road, N.E., as the location of Cloud's District of Columbia office. The Largo address seems to be the residence of Eric Cloud and his wife, Carole.

Carole Cloud is a law school graduate who is not admitted to practice in any jurisdiction, although not for want of having

----

. . . .

(b) ... knowingly fail to respond to a lawful demand for information from a[ ] ... disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6 [client confidences]."

3. BOP § 10–301(d) defines "trust money" to mean money "that a person entrusts to a lawyer to hold for the benefit of a client or a beneficial owner." A lawyer is prohibited by BOP § 10–302(a) from accepting trust money "[u]nless [the] lawyer or the firm of the lawyer maintains an attorney trust account in accordance with" the trust money subtitle of Title 10, "Lawyers," of BOP. A violation of the attorney trust accounts part of the trust money subtitle subjects the lawyer to disciplinary proceedings. BOP § 10–307.

4. The Henderson of Cloud & Henderson is Ronald E. Henderson, a relative of Cloud, who was admitted to the Ohio bar. Other than in the firm name, Henderson's name does not appear on the Cloud & Henderson stationery that is in evidence in the instant matter. Henderson is not in any way involved in the events underlying the charges against Hallmon.

tried. She is the self-described office manager and coordinator for her husband's practice.

In early 1991 Eric Cloud and Hallmon entered into an arrangement under which Hallmon would represent the clients of Eric Cloud who required counsel admitted in Maryland. One of Eric Cloud's clients was The Church of the Great Commission (the Church) where the Clouds were members of the congregation. The Church is located in the municipality of District Heights, Prince George's County, where the Church also operates a small day school and a day care nursery on its premises. In 1986 when it was named Parkway Baptist Church, the Church had obtained a special exception for those operations, following a zoning hearing at which Eric Cloud, accompanied by a Maryland attorney, had appeared on behalf of the Church.

For the school year beginning in September 1992 the Church sought to increase its enrollment to sixty-two day care children and thirty-eight private school students. This plan necessitated a "departure" from parking space requirements amounting to nineteen spaces over and above such departures previously approved.

The hearing on the requested special exception was held in September 1992 before Richard A. Romine (Romine), a Zoning Hearing Examiner for Prince George's County. Hallmon appeared at that hearing as counsel for the Church. There was no fee to Hallmon or to Eric Cloud for the representation. There was no opposition to the requested departure. District Heights supported the application, subject to a condition that was unobjectionable to the Church. The technical staff of the National Capital Park and Planning Commission (the Commission) recommended approval of the proposal, and the Prince George's County Planning Board agreed with the staff's recommendation. The special exception was recommended by the hearing examiner, whose decision became final in March 1993 in accordance with § 27–312 of the Prince George's County Code.

Shortly after the hearing before him, Romine filed a complaint with Bar Counsel raising the issue of unauthorized practice of law by Carole Cloud in connection with the Church's 1992 special exception proceedings. Charges flowing out of that conduct, together with the additional charges developed in the course of the investigation, were referred for hearing to Judge Graydon S. McKee, III of the Circuit Court for Prince George's County. Judge McKee found that Hallmon committed the charged violations. The matter is now before this Court on Hallmon's exceptions to Judge McKee's report.

## I

### *Assisting Unauthorized Practice*

■■■ BOP § 10–101(h)(1) defines "Practice law" to mean "to engage in any of the following activities:

(i) giving legal advice;

(ii) representing another person before a unit of the State government or of a political subdivision; or

(iii) performing any other service that the Court of Appeals defines as practicing law."

In the instant matter Carole Cloud prepared the application for special exception, signing Hallmon's name and placing her initials behind that signature. She prepared the statement of justification for the special exception, and she prepared and signed in Hallmon's name a letter requesting expedited handling of the application. Hallmon testified that he approved "most of" the papers filed in the case after reviewing them over the telephone with Carole Cloud whom he then authorized to sign his name. After reviewing this evidence, Judge McKee made no finding rejecting Hallmon's testimony. It is undisputed that Carole Cloud met with the representatives of the Church and was the person who met on behalf of the Church with the technical staff of the Commission. None of the foregoing, in and of itself, supports finding a violation of Rule 5.5.

The finding is supported, however, by the transcript of the hearing before Examiner Romine. Before addressing that evidence it will be helpful to review the current state of the law concerning the use by attorneys of laypersons in roles commonly described as "law clerks," "paralegals," or "legal assistants."

■ This Court has always found it difficult to craft an all encompassing definition of the "practice of law." To determine what is the practice of law we must look at the facts of each case and determine whether they " ' "fall[ ] within the fair intendment of the term." ' " *In re Application of Mark W.*, 303 Md. 1, 8, 491 A.2d 576, 579 (1985) (quoting *Grievance Comm. v. Payne*, 128 Conn. 325, 329, 22 A.2d 623, 625 (1941)). The purpose of Rule 5.5 "is to protect the public from being preyed upon by those not competent to practice law—from incompetent, unethical, or irresponsible representation." *In re Application of R.G.S.*, 312 Md. 626, 638, 541 A.2d 977, 983 (1988). That "goal ... is achieved, in general, by emphasizing the insulation of the unlicensed person from the public and from tribunals such as courts and certain administrative agencies." *Id.*

■ To determine whether an individual has engaged in the practice of law, the focus of the inquiry should "be on whether the activity in question required legal knowledge and skill in order to apply legal principles and precedent." *In re Discipio*, 163 Ill.2d 515, 206 Ill.Dec. 654, 658, 645 N.E.2d 906, 910 (1994); *Louisiana State Bar Ass'n v. Edwins*, 540 So.2d 294, 299 (La.1989) ("Functionally, the practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer."). "Where trial work is not involved but the preparation of legal documents, their interpretation, the giving of legal advice, or the application of legal principles to problems of any complexity, is involved, these activities are still the practice of law." *Lukas v. Bar Ass'n of Montgomery County*, 35 Md.App. 442, 448, 371 A.2d 669, 673, *cert. denied*, 280 Md. 733 (1977) (quoting F.T. vom Baur, *Administrative*

*Agencies and Unauthorized Practice of Law,* 48 A.B.A. J. 715, 716 (1962)).

Both Rule 5.5 and case law allow lawyers to employ law clerks and paralegals without the lawyers' assisting in the unauthorized practice of law. The Rule 5.5 comment states that the rule "does not prohibit a lawyer from employing the services of paraprofessionals and delegating functions to them, so long as the lawyer supervises the delegated work and retains responsibility for their work." In addition, this Court has rejected a restrictive approach under which "[l]aw clerks ... who undertake various tasks under the supervision of licensed lawyers" might be engaged in the unauthorized practice of law. *In re Application of R.G.S.,* 312 Md. at 636, 639–40, 541 A.2d at 982, 983–84.

The legal profession has a long history of utilizing the services of knowledgeable secretaries and of law clerks. But the view has always been that a legal assistant's

"work [is] of a preparatory nature, such as research, investigation of details, the assemblage of data and other necessary information, and such other work as will assist the employing attorney in carrying the matter to a completed product, either by his personal examination and approval thereof or by additional effort on his part. The work must be such, however, as loses its separate identity and becomes either the product, or else merged in the product, of the attorney himself."

*Ferris v. Snively,* 172 Wash. 167, 176–77, 19 P.2d 942, 945–46 (1933).

The American Bar Association similarly stresses the importance of attorney supervision of paraprofessionals in its definition of a legal assistant.

" 'A Legal Assistant is a person, qualified through education, training, or work experience, who is employed or retained by a lawyer, law office, governmental agency, or other entity in a capacity or function which involves the performance, *under the ultimate direction and supervision of an attorney,* of specifically-delegated substantive legal

work, which work, for the most part, requires a sufficient knowledge of legal concepts that, absent such assistant, the attorney would perform the task.' "

*NonLawyer Activity in Law–Related Situations* 52 (A.B.A. Comm'n on NonLaw. Prac. ed.1995) (quoting A.B.A., Minutes of the Board of Governors 5 (Feb. 6–7, 1986)) (emphasis added).

Those who advocate the expanded use of legal assistants acknowledge that "[a]dequate supervision is an ethical requirement." A.G. Greene & K. Williams–Fortin, *Expanding the Role of the Legal Assistant—Why Do It?*, in *Leveraging With Legal Assistants* 6, 8 (A.B.A. Sec. of Law Prac. Mgmt., A.G. Greene ed., 1993). "The level of supervision may vary, depending on the type of work involved and the competence of the legal assistant, but it must always be present." *Id.*

■ The New Jersey Supreme Court made a detailed analysis of the work of paralegals in *In re Opinion No. 24 of the Comm. on the Unauthorized Practice of Law,* 128 N.J. 114, 607 A.2d 962 (1992). The court stated that "[t]here is no question that paralegals' work constitutes the practice of law." 607 A.2d at 966. Whether paralegals engage in the unauthorized practice of law depends on whether they are adequately supervised by an attorney. *Id.* at 963, 969. In New Jersey attorneys may delegate legal work to paralegals "if they maintain direct relationships with their clients, supervise the paralegal's work and remain responsible for the work product." *Id.* at 969. If the "attorney is not directly supervising [the paralegal's work,]" or "the supervision is illusory because the attorney knows nothing about the field in which the paralegal is working," the paralegal is engaged in the unauthorized practice of law. *Id.*

That New Jersey opinion also cites guidelines that several states had adopted. For example, in Colorado, a paralegal's work is not the unauthorized practice of law if "the lawyer establishes the attorney-client relationship, . . . maintains control of all client matters[,]" supervises performance of the paralegal's duties, and reviews the paralegal's work product,

and if the paralegal's work "merge[s] with and becomes part of the attorney's work product," without the paralegal's exercising unsupervised legal judgment. *Id.* at 972. Colorado allows client contact by the paralegal "once the attorney-client relationship has been established." *Id.* at 973. The New Jersey court noted that the Bars of Michigan, Missouri and New York had adopted similar requirements. *Id.*

■ Law clerks and paralegals perform a variety of services for attorneys but they may not give legal advice, accept cases, set fees, appear in court, plan strategy, make legal decisions, or "chart the direction of a case." A.G. Greene & K. Williams–Fortin, *Expanding the Role of the Legal Assistant— How Do You Make It Work?*, in *Leveraging With Legal Assistants* at 18, 19. The authors opine that under the supervision of a licensed attorney, a legal assistant, for example, may obtain facts from the client, communicate information to the client, interview witnesses, "perform[ ] limited research to assist the lawyer with the legal analysis," obtain documents, obtain photographs, prepare summaries, prepare chronologies, prepare itemization of claims, prepare drafts of pleadings, prepare drafts of interrogatories and of production of document requests, prepare drafts of responses to discovery requests, prepare outlines for the lawyer to use in deposing a witness, index deposition transcripts, and prepare summaries of the evidence. *Id.* at 20.

■ The key in all of these examples is supervision. The attorney may "not under any circumstance delegate to [a law clerk] the exercise of the lawyer's professional judgment in behalf of the client. . . ." *Louisiana State Bar Ass'n v. Edwins,* 540 So.2d at 300. Thus, in *Attorney Grievance Comm'n v. James,* 340 Md. 318, 666 A.2d 1246 (1995), where we found that a suspended attorney was practicing law as a purported paralegal, we held that the record supported the hearing judge's rejection of the contention that the purported employer was "the supervising attorney" and that the suspended attorney was the paralegal. *Id.* at 332–33, 666 A.2d at 1252–53.

An essential function of the lawyer in a special exception application of the subject type is evaluation of the data that has been gathered by lay assistants, by the client, and by the Commission's staff in order for the lawyer to determine whether the data presents a sufficient and persuasive case. Here the information-gathering and communicating contacts by Carole Cloud with the client and with the Commission staff were not the practice of law. Nevertheless, the record before Examiner Romine supports finding that Hallmon never applied his legal knowledge and training to evaluating the presentation that had been worked up by Carole Cloud. We quote liberally from the transcript.

"EXAMINER: ... Who is here on behalf of the applicant?

"MR. HALLMON: We all are. I am Morgan Hallmon, the supervising attorney representing the Church of the Great Commission. And, in addition, I have my law clerk and associate, Carole Cloud, who has been handling the day-to-day details; Mr. Gibson, who is the overseer of the actual project at the ... church.

"EXAMINER: Okay. Well, you can set up as you wish.

"MR. HALLMON: Thank you.

"EXAMINER: Just give me a short-line appearance, you know, of your appearance in the record. Give me your address and your phone number.... And we will mark Mr. Hallmon's entrance of his appearance as Exhibit R–25. Okay, Mr. Hallmon.

"MR. HALLMON: *I will defer to my associate, Ms. Cloud.*

"EXAMINER: Are you an attorney?

"MS. CLOUD: I am not licensed in Maryland.

"EXAMINER: Are you licensed anywhere?

"MS. CLOUD: No....

. . . .

"MR. HALLMON: However, I am licensed to practice in the state of Maryland and the District of Columbia.

"EXAMINER: Is that your signature?

"MR. HALLMON: I have authorized my law clerk to—

. . . .

"MR. HALLMON: But I am Morgan Hallmon. If you would like, I shall show you my Bar card, and you can check with the Maryland Bar with respect to my admission to—

"EXAMINER: I already have, Mr. Hallmon.

"MR. HALLMON: Okay, thank you.

"EXAMINER: And I have already checked on you too, Ms. Cloud.

"MS. CLOUD: All right, and I have initialed everything too.

"MR. HALLMON: With all due respect, I am not quite sure if I understand the purpose of the previous exercise. Can you clarify that for the record?

"EXAMINER: Well, I just like to know who is doing business before me.

"MR. HALLMON: Okay, all right. Okay.

"EXAMINER: Okay. Now you may proceed as you wish.

"MR. HALLMON: Thank you. *I will defer to my law clerk, Ms. Cloud.*

"EXAMINER: As for what?

"MS. CLOUD: Coordinator.

"MR. HALLMON: As coordinator.

"EXAMINER: For what?

"MR. HALLMON: Well—

"EXAMINER: *Is she going to be a witness?*

"MR. HALLMON: *No.* Let me point out that this is my first time attending such a hearing. Therefore, I am not familiar with the procedure. It was my understanding that there would be a Staff Report and that we would be apprised of the findings, and if there were questions which you had, we would answer those. I was not aware of the fact that we were expected to make a presentation, but if that is your request, then we shall proceed. We have an

application before the Commission, and we are here to respond to any questions that you may have.

"EXAMINER: I take it, Mr. Hallmon, then that you have had very little involvement with the case until today?

"MR. HALLMON: With respect to day-to-day matters, I have been aware of what has been going on in the case. That is correct. *Yes, I have deferred to Ms. Cloud, giving her responsibility for that and she has kept up with that.*"

The examiner then sought to elicit from Hallmon the specifics of the latter's participation in the case preparation.

"MR. HALLMON: Well, my—as a matter of fact, until you [tell] me the purpose, I'm sorry. I decline to answer the question.

"EXAMINER: That's fine, good. Okay. Now you may proceed however you want to proceed.

"MR. HALLMON: Okay. *How would you like us to proceed?*

"EXAMINER: *Mr. Hallmon, you are the attorney for the applicant.*

"MR. HALLMON: *Mr. Romine, I will defer to my client who is prepared to answer any questions* that the Commission may have with respect to our application, and I assume—

"EXAMINER: *Ms. Cloud is your client?* You said defer to your client and you—

"MR. HALLMON: Wait a minute. My understanding with respect to this hearing is to address any concerns that the Commission may have with respect to the church's application. If that is not my understanding—if my understanding is incorrect, I would like to be apprised of that at this time.

"EXAMINER: Well, it is obvious that you know nothing about our proceedings.

"MR. HALLMON: It is obvious that I know absolutely nothing about your proceedings, and I so stated that when I sat down.

"EXAMINER: Okay. The applicant has a burden of proof, the same as in any adversarial proceeding.

"MR. HALLMON: Okay.

"EXAMINER: The applicant has the burden of proving their case. That case can be proved by you relying upon the record as it exists now, or you can present other evidence if you wish to present other evidence.

"MR. HALLMON: Okay.

"EXAMINER: It is the same as a courtroom proceeding.

"MR. HALLMON: And so there will be no staff presentation or recommendation?

"EXAMINER: Not except what is in the file.

"MR. HALLMON: So the only purpose of this session today is to obtain additional information that the applicant is willing to present. Is that correct?

"EXAMINER: Or if there is someone who wishes to testify in opposition, they can come and testify in opposition.

. . . .

"MR. HALLMON: ... Okay. I do not believe that we are at this point submitting any additional information. We have reviewed the findings, and we have addressed the concerns that are so stated. *However, since I did not talk to my client prior to coming to the session this morning, it is quite possible that there might be one or two comments that they would like to make. And I will defer to Ms. Cloud in the event that she*—and she has been in contact with the client prior to this morning—*to ascertain whether or not there is any additional information that the church would like to submit, either orally or in writing, this morning.*

"MS. CLOUD: Okay. For the record, my name is Carole Cloud. I am the law clerk and office manager at the office. I coordinate—

"EXAMINER: Where is the office?

"MS. CLOUD: Law firm of Cloud and Henderson in Largo, Maryland, and in Washington, D.C. I coordinate and

manage the office. I interview the clients. I prepare a lot of drafts and documents prior to their submission to the attorneys. I am mainly in contact with most clients on a regular and daily basis. Then I submit my information to the attorneys at our meetings, at our meetings on the client file, on a regular basis. I am constantly working under the supervision of Mr. Morgan Hallmon and Mr. W. Eric Cloud. Because I have been an office manager and worked with the attorneys for close to 10 years now, they rely on me to handle most of the office work while they are in court, so that the clients regularly stay in touch with me, and then I gather all of that information and I report that to the attorneys. In this particular instance, I was the contact person between the church and the Park and Planning Commission, and the overseer of the church properties. I gathered all of the information. I contacted the surveyors.

"I was in contact with [the staff] on a regular basis and pretty much pulled the whole program together, and when things were in order, then I would present them to Mr. Hallmon. He would then discuss them with me. We determined whether there are any problems, additional problems that need to be addressed, and if there were, then I would have my work cut out for me to go and try to clear up any matters and concerns that had been determined. So I was in a day-to-day contact with the Park and Planning Commission and in a coordinating and document-preparation capacity. And only after completing most of the detailed work, Mr. Hallmon would then be apprised of what was done.

"The document preparation was prepared by me. Mr. Hallmon and Mr. Cloud would only review the documents after I prepared them. Many motions are prepared by me that go to court. Only after it is reviewed by the attorneys are the documents submitted. And that is fairly much how this process proceeded as well, and it is pretty much how the day-to-day operation of our office runs.

"I just wanted to make that fairly clear. Because the clients cannot be in touch, we are a very small law firm, and

cannot be in touch regularly with Mr. Hallmon and with Mr. Cloud. I am the person that has to coordinate pretty much everything that goes on in the office. But I cannot practice law. I do not practice law. Everything must be supervised and submitted to the attorneys prior to any documentation being submitted to this body or to the court body.

"MR. HALLMON: *Is there anything that we would like to add regarding this particular application?*

"MS. CLOUD: Regarding this particular application, after it had been reviewed, let *the client,* the applicant, the Church of the Great Commission *has reviewed the application, and I have been there with the president to review the application, we find that the comments and the recommendations were reasonable.* I submitted those to Mr. Hallmon, and it was his understanding that the client, the Church of the Great Commission, felt that they were reasonable and not anything out of the ordinary that the church could not comply with. A lot of the comments and the recommendations—well, some of the comments and recommendations that have been made by the Staff Report—the applicant has already proceeded with making the necessary corrections or following through and complying with the Staff Report.

"If there is anything in addition to what was submitted in the Staff Report, the client, the applicant is not aware at this time. But I must say that the surveyors have not been contacted regarding a lot of the changes yet that have to be made on the Site Plan. Those will be submitted to the surveyor this week so that all of the Site Plan can be brought up to date according to the Staff Report."

(Emphasis added).

This record demonstrates, to the standard of clear and convincing evidence, the lack of supervision of Carole Cloud by Hallmon. Hallmon did not know whether the strategy was to rest on the record or whether a presentation, in addition to the client's previously filed justification and the technical staff's report, would be made at the hearing. It is also

apparent from Hallmon's immediate and later deferrals to Carole Cloud that Hallmon did not know how to respond to any questions that the examiner may have had. The hearing record demonstrates by clear and convincing evidence an abdication of supervision by Hallmon and that the lay legal assistant was unauthorizedly practicing law.

The petition for disciplinary action also charged that Hallmon violated Rule 1.1 by failing to handle the Church's zoning application with competence. Under the facts of this case the alleged lack of competence is simply a byproduct of Hallmon's lack of supervision of the legal assistant. The conduct underlying the charges of violating Rules 1.1 and 5.5 is the same. For purposes of an appropriate sanction we consider the Rule 5.5 violation to be the more serious under these facts.

## II

The facts concerning the charge of Hallmon's violating Rule 8.1(b) begin with Romine's written complaint to Bar Counsel dated September 21, 1992. By letter of September 25, 1992, an Assistant Bar Counsel requested that Hallmon explain precisely his relationship with Eric Cloud. After receiving certain of the exhibits to Romine's complaint, Hallmon, on October 15, 1992, wrote a two-page, single-spaced letter, the gist of which was the following:

"If the client has a matter in Maryland, the case is referred to me. Under my direct supervision, most pleadings are prepared by the Clouds and reviewed and approved by me before filing."

Thereafter, on November 2, 1992, Hallmon wrote a twelve-page, point-by-point critique of Romine's letter of complaint. In his response Hallmon stated that he had reviewed the findings of the Commission staff with the client and that he did not believe that a presentation was required at the September 1992 zoning hearing because of the presentation that had been made supporting the original application in 1986.

In response to a November 9 inquiry from an Assistant Bar Counsel, Hallmon on November 30 advised that he did not use

timesheets, and he furnished Bar Counsel with a list of the matters that he had handled for Cloud & Henderson.

In the spring of 1993 an investigator from Bar Counsel's office had been interviewing individuals involved in the Romine complaint. The investigator then telephoned Hallmon seeking an appointment to interview him. The investigator explained that some of the information that Hallmon had furnished in his written responses to Bar Counsel did not coincide with some of what the interviewees had stated. Hallmon expressed confusion about the process to the investigator. Hallmon took the position that Bar Counsel should request the interview and also assure Hallmon that he had received all that he was entitled to receive from Bar Counsel's file. An Assistant Bar Counsel, by letter of June 3, 1993, wrote to Hallmon requesting that Hallmon meet with the investigator to discuss Hallmon's "relationship and arrangements with Mr. Cloud generally and the zoning hearing matter specifically." Assistant Bar Counsel advised that, if the interview were denied, he would recommend an Inquiry Panel which could subpoena Hallmon. In a two-page, single-spaced letter of June 11, Hallmon declined to be interviewed. He stated that his submitting to an interview would not advance the matter procedurally, but that convening an Inquiry Panel would provide him the opportunity to clear his name.

There is a strong inference that Bar Counsel's desire to interview Hallmon had as much, or more, to do with an investigation by Bar Counsel of Eric Cloud than it did with the specifics of the Romine complaint. Even if we assume that the purpose of the interview was primarily an investigation of Eric Cloud, that is not defensive to the charge of violating Rule 8.1(b). A demand by a disciplinary authority for information, the refusal of which is sanctionable under Rule 8.1(b), may relate to the conduct of the lawyer from whom the information is sought, or it may relate to the conduct of another lawyer. Comment to Rule 8.1 ("The duty imposed by this Rule applies to a lawyer's own ... discipline as well as that of others"); see Wolfram, *Modern Legal Ethics*

§ 12.10.2 (1986). Further, Hallmon has raised no issue of client confidentiality or of self-incrimination.

Hallmon's exceptions related to the Rule 8.1(b) violation are overruled.

## III

 At the Inquiry Panel hearing Hallmon testified that, from an office in his home, he represented clients who had come to him directly, in addition to the services that he performed for clients of Eric Cloud. The matters of most of Hallmon's personal clients were contingent fee cases. Hallmon admitted to the Panel that he did not have a trust account with "the Clouds." Nor in his own practice did Hallmon "set up a trust account because [he] didn't have any client funds to maintain." He further admitted to the Panel, however, that he had received fees in advance, for work to be done, and that under those circumstances he deposited the funds into his own private account.

At the Inquiry Panel hearing Hallmon was also asked the following:

"If Bar Counsel were to come in, knock on your door today and say where are your records showing all the money that clients from the day you hung up your shingle through today, where are your records showing all the money that clients have given you? Give me those records. Could you give me those records?"

Hallmon's response was, "No."

Consequently, the charges involving the failure to maintain a trust account were established.

## IV

 Hallmon excepts generally to Judge McKee's report, alleging that the hearing was unfair. In support of that contention Hallmon argues that Judge McKee refused to permit Hallmon to call as a witness the Assistant Bar Counsel who presented the case in support of the charges against

Hallmon. Hallmon's exception is overruled for two reasons. First, Judge McKee's ruling is not erroneous. Bar Counsel had argued that Hallmon's attempt to make Bar Counsel a witness was for the purpose of excluding Bar Counsel from further participation as an advocate in the proceeding. See Rule 3.7. Judge McKee thereupon required Hallmon to make a proffer demonstrating the necessity for Bar Counsel's testimony, but Hallmon was unable adequately to do so. Second, even if we assume that Judge McKee's ruling was erroneous, the error was not prejudicial to Hallmon. Hallmon sought to interrogate the Assistant Bar Counsel about a different complaint from that of Romine that was also heard before Judge McKee in the same proceedings. Judge McKee found that Bar Counsel had not established the violation charged in the other complaint.

## V

We now consider the appropriate sanction. Hallmon has no record of prior disciplinary violations, but he has managed to commit three relatively serious violations very early in his legal career. In acting as counsel for himself in the defense of these disciplinary charges Hallmon has followed the strategy of pointing to the mote in the eye of his accusers, without recognizing his own shortcomings. Blending all of these factors, we impose the following sanction.

1. Hallmon is suspended from the practice of law for ninety days, effective beginning thirty days after the filing of this opinion.

2. Hallmon shall:

(a) Within five days from the date of filing of this opinion provide Bar Counsel with the names and addresses of respondent's current clients and identify client matters currently pending in court; and

(b) Within fifteen days from the date of filing of this opinion provide Bar Counsel with a copy of a letter mailed by Hallmon to each such client, and to counsel for any adverse party or to

any unrepresented adverse party, notifying them of this suspension.

3. Termination of Hallmon's suspension is further subject to Hallmon's having satisfied Bar Counsel that the following conditions have been met:

(a) Hallmon shall have registered, and prepaid the tuition, at an accredited law school for a course on the Maryland Lawyers' Rules of Professional Conduct, or other Legal Ethics course, and Hallmon shall have represented and warranted to Bar Counsel, and thereby, to this Court, that Hallmon will diligently pursue and successfully complete that course. Breach of this representation and warranty may be considered to be a violation of one or more of the Maryland Lawyers' Rules of Professional Conduct;

(b) Hallmon shall have registered, and prepaid the tuition, for a course, approved by Bar Counsel, on law office management, including training in accounting for escrow funds, and Hallmon shall have represented and warranted to Bar Counsel, and thereby, to this Court, that Hallmon will diligently pursue and successfully complete that course. Breach of this representation and warranty may be considered to be a violation of one or more of the Maryland Lawyers' Rules of Professional Conduct;

(c) Hallmon shall have engaged, at his expense, a monitor, acceptable to Bar Counsel, who will oversee both Hallmon's practice of law and Hallmon's accounting for funds entrusted to him, subject to further order of this Court;

(d) Hallmon shall have complied with paragraph 2 of this order; and

(e) Hallmon shall have paid all costs assessed pursuant to the mandate in this matter.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTOR-*

*NEY GRIEVANCE COMMISSION OF MARYLAND AGAINST MORGAN JOSEPH HALLMON.*