704 A.2d 1225

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Herschel D. MILLIKEN.**

**Misc. Docket (Subtitle BV) Nos. 46, 49, Sept. Term, 1995.**

Court of Appeals of Maryland.

Jan. 22, 1998.

Melvin Hirshman, Bar Counsel, and Raymond A. Hein, Asst. Bar Counsel, for Attorney Grievance Commission of Maryland, petitioner.

Herschel D. Milliken, Baltimore, for respondent.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, RAKER and WILNER, JJ., and KARWACKI, J. (retired, Specially Assigned).

RAKER, Judge.

Acting through Bar Counsel, the Attorney Grievance Commission filed two petitions for disciplinary action against Herschel D. Milliken for violations of the Rules of Professional Conduct. On February 14, 1996, this Court consolidated the two petitions. We referred the matter, pursuant to Maryland Rule BV9 (b)[1] to Judge Carol E. Smith of the Circuit Court for Baltimore City to make findings of fact and conclusions of law. Following an evidentiary hearing and oral argument involving ten separate complaints, Judge Smith found evidence sufficient to sustain nine of the ten complaints. Judge Smith found that Milliken had repeatedly violated Rules 1.1,[2] 1.3,[3] 1.4,[4] 1.15(a), (b),[5] 1.16(d),[6] 3.2,[7] 5.3(b),[8] 5.4(a),[9] 8.1,[10] 8.4,[11] of the

---

1. By order dated June 5, 1996, effective January 1, 1997, this Court renumbered Maryland Rules governing attorney discipline proceedings and attorney trust accounts. Formerly under subtitle BV, attorney disciplinary proceedings are now found in Chapter 700, Maryland Rules 16–701 through 16–718. Formerly under subtitle BU, the rules regarding attorney trust accounts are now found in Chapter 600, Maryland Rules 16–601 through 16–612. In this opinion, all reference to the Maryland Rules will be to the former Maryland Rules, BV1 through BV18 and BU1 through BU18, which were in effect at the time these proceedings were commenced.

2. **RULE 1.1. COMPETENCE.**
   A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation.

3. **RULE 1.3. DILIGENCE.**
   A lawyer shall act with reasonable diligence and promptness in representing a client.

4. **RULE 1.4. COMMUNICATION.**
   (a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.
   (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

5. **RULE 1.15. SAFEKEEPING PROPERTY.**
   (a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Subtitle BU of the Maryland Rules.

Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in the Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

6. **RULE 1.16. DECLINING OR TERMINATING REPRESENTATION.**

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

7. **RULE 3.2. EXPEDITING LITIGATION.**

A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

8. **RULE 5.3. RESPONSIBILITIES REGARDING NONLAWYER ASSISTANTS.**

With respect to a nonlawyer employed or retained by or associated with a lawyer:

\* \* \* \* \* \*

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer;

9. **RULE 5.4. PROFESSIONAL INDEPENDENCE OF A LAWYER.**

(a) A lawyer or law firm shall not share legal fees with a nonlawyer . . .

10. **RULE 8.1. BAR ADMISSION AND DISCIPLINARY MATTERS.**

An applicant for admission or reinstatement to the bar, or a lawyer in connection with a bar admission application or in connection with a disciplinary matter, shall not:

\* \* \* \* \* \*

(b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this Rule does not require disclosure of information otherwise protected by Rule 1.6.

11. **RULE 8.4. MISCONDUCT.**

It is professional misconduct for a lawyer to:

\* \* \* \* \* \*

Maryland Rules of Professional Conduct, and Maryland Rules BU7(a)[12] and BU9.[13] We set forth those findings and conclusions as follows:

## FINDINGS OF FACTS AND CONCLUSIONS OF LAW

### Introduction

"Herschel D. Milliken, Esquire is the subject of two Petitions for Disciplinary Action filed by the Attorney Grievance Commission ("AGC") of Maryland pursuant to Maryland Rule BV9. Bar Counsel, acting on the direction of the Review Board and pursuant to Maryland Rule BV7, filed charges against the Respondent pertaining to eight separate Complaints received by the Review Board. The charges related to each Complaint were set forth in the Petition for Disciplinary Action, case number 96022071. On January 18, 1996, the Court of Appeals ordered that the charges be transmitted to the Circuit Court for Baltimore City for service and hearing in accordance with Maryland Rule BV9. On February 13, 1996, Bar Counsel, again acting on the direction of the Review Board, filed a second set of charges against Respondent Milliken pertaining to two Complaints by former clients. The charges related to these two Complaints were set out in the second Petition for

---

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

**12. RULE BU7. Commingling of Funds.**
a. *General Prohibition.*
An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by BU4 or permitted to be so deposited by section b. of this Rule.

**13. RULE BU9. Prohibited Transactions.**
An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or the bearer.

Disciplinary Action, Case number 96053040. On February 14, 1996, the Court of Appeals ordered that these new charges be transmitted to the Circuit Court for Baltimore City, and further ordered that the Petitioner's Motion for Consolidation of these two matters for a hearing of charges be granted.

"The charges in both Petitions allege that the Respondent engaged in misconduct, defined by Maryland Rule BVl(k) as "an act or omission by an attorney, individually or in concert with any other person or persons which violates the Maryland Rules of Professional Conduct, as adopted by Rule 1230, whether or not the act or omission occurred in the course of an attorney-client relationship." The hearings on both Petitions for Disciplinary Action were held before the undersigned judge, and took place over the course of several days in April and May, 1996. Raymond Hein, Assistant Bar Counsel, represented the Petitioner, Attorney Grievance Commission of Maryland. Herschel D. Milliken, the Respondent, proceeded pro se. In support of its allegations, Petitioner's counsel entered nineteen exhibits into evidence.

### Standard of Proof

"Maryland Rule BVlO(d) provides that the hearing of charges is governed by the same rules of law, evidence, and procedure as in civil proceedings in equity. Consequently, factual findings shall be supported by clear and convincing evidence. In contrast, an attorney establishing a defense, including mitigating circumstances, need only prove factual matters by a preponderance of the evidence. *Attorney Grievance Commission v. Bakas*, 322 Md. 603, 589 A.2d 52, modified, 323 Md. 395, 593 A.2d 1087 (1991).

### Background

"At the hearings before this Court in April and May, 1996, the following facts were established by clear and convincing evidence.

"The Respondent attended the University of Baltimore School of Law, and obtained his Juris Doctor degree in

1979. Mr. Milliken was admitted to practice in Maryland in September 1981. Except for one year when he worked for the firm of Singleton, DeShiell & Robinson, Milliken has historically engaged in the general practice of law as a sole practitioner. The Respondent has always practiced law in Baltimore City, and currently maintains a law office in his home at 1509 East 36th Street, Baltimore, Maryland.

## I. Complaint of Tonya L. Steward (Dorsey)

"As a preliminary matter before this Court, Petitioner requested that Mr. Milliken stipulate to the submission of the IPT of Ms. Dorsey because she had moved from her last known address, and the Petitioner was unable to locate her. The Respondent refused to stipulate to this witness' testimony and stated that he was interested in conducting a cross-examination of Ms. Dorsey on certain matters. The Respondent had an opportunity to cross-examine Ms. Dorsey at the IPH on March 21,1994. The Respondent also stated that he wished to see if the witness would recant her testimony. The Respondent further suggested that Petitioner's Counsel had not satisfactorily proven Ms. Dorsey's unavailability as defined by Maryland Rule 5–804(a).

"Finding that Ms. Dorsey was absent from the hearing and that Bar Counsel had made reasonable, albeit unsuccessful, attempts to procure her attendance through the issuance of subpoenas at her last known address, this Court declared Ms. Dorsey to be "unavailable" in accordance with Maryland Rule 5–804. Due to Mr. Milliken's prior opportunity to cross-examine Ms. Dorsey, this Court held that Ms. Dorsey's former testimony at the IPH was admissible under the standards set forth in Maryland Rule 5–804.

"At the April 16, 1996 hearing before this Court, the Petitioner introduced evidence and testimony obtained through its investigation of this Complaint and established the following facts. Tonya Dorsey met Respondent in May, 1993, and hired him to represent her in a divorce case. A fee was agreed upon at that time. Although there was a discrepancy between Ms. Dorsey's testimony that the Re-

spondent wanted $700.00 and Respondent's testimony at the Circuit Court hearing that his standard fee in such a matter was $350.00, it is clear from the evidence that Ms. Dorsey wrote a check on May 5, 1993, to Herschel D. Milliken payable in the amount of $200.00 as partial payment of his fee for representation. There was no written retainer agreement and she did not receive any correspondence either during, or after the period in which the Respondent was supposed to be representing her.

"Ms. Dorsey's case had already been filed and a hearing was scheduled for June 4, 1993.

"The Respondent accepted and kept the $200.00 paid to him by Ms. Dorsey despite the fact that he never performed any work beyond conducting the initial interview. He never reviewed the court file to check the status of Ms. Dorsey's case. He conceded that he had no justification for keeping Ms. Dorsey's $200.00 payment and he did not deposit her check in a trust account. Instead, he cashed it immediately. Curiously, Respondent noted his trust account number on the back of the check. However, this was done to identify him as a person who maintained an account with the bank in order that the bank would cash the check, and not for the purpose of placing it in the trust account.

"In fact, Mr. Milliken admitted that he tried to liquidate checks as soon as possible. It appears from his testimony that generally checks were either cashed immediately or placed directly in his operating account.

"Mr. Milliken testified several times over the course of the hearing that it was his policy to be paid in full before appearing in court or performing any work. Indeed, he suggested in this particular instance that he did not show up because he had not been paid the balance. Both the Respondent and Ms. Dorsey agreed that her case already had been filed and a trial was scheduled for June 4, 1993. Although she left several messages on the Respondent's answering machine, Ms. Dorsey was unable to reach him to discuss her divorce and the balance of the fee. After paying Mr. Milliken the $200.00 retainer, she was not contacted by

him until June 3, 1993, the day before her hearing. During this phone conversation, the Respondent instructed Ms. Dorsey to meet him in court the next day with the balance of his fee. However, the Respondent failed to appear the next day for Ms. Dorsey's hearing. Ms. Dorsey was forced to proceed without an attorney. The Respondent telephoned Ms. Dorsey on June 5, 1993 to apologize for his behavior and promised to refund the money she had paid. However, no refund was ever made.

"In light of the clear and convincing evidence as set forth above, this Court finds that the Respondent violated Maryland Rule 1.1 of the Rules of Professional Conduct which provides that "a lawyer shall provide competent representation to a client" and Maryland Rule 1.3 which requires that an attorney act "with reasonable diligence and promptness in representing a client." Mr. Milliken's failure to contact his client, to review her file and prepare her case, and to appear in court are clear violations of these rules. Further, the Respondent's lack of communication with Ms. Dorsey, which was evidenced by his neglecting to send her correspondence, failing to respond to her phone messages and/or failing to contact her by telephonic or other means of communication to inform and prepare her for trial violates Maryland Rule 1.4(a) which obligates a lawyer to "keep a client reasonably informed about the status of the matter and promptly comply with reasonable requests for information." Finally, according to Maryland Rule 1.16(d), Mr. Milliken had a duty to "take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, . . . surrendering papers and property to which the client is entitled and refunding any advance payment of the fee that has not been earned." In dereliction of this duty Milliken never formally terminated his representation, nor did he surrender all documents and property to this client or refund the $200 of Ms. Dorsey's money that he admitted he did not earn.

"Although the Respondent stated, presumably by way of defense or mitigation, that this and other client files were

destroyed in office fires, he failed to produce any evidence to show that such fires ever occurred. Throughout the proceedings before this Court, the Respondent referred to fires allegedly taking place at his offices at 2901 Druid Park Drive. In response to inquiries concerning his lack of documentation and inability to produce files, Mr. Milliken asserted that his paperwork and files were destroyed in these fires. However, Mr. Milliken was unable to produce even a scintilla of evidence that these fires actually occurred despite the fact that he had ample opportunity to do so for several years during the investigation process and again over the course of the hearings before this Court. In fact, the Respondent could not provide this Court with even dates certain as to when the fires took place. To the contrary, John Reburn an investigator for the AGC contacted Mr. Milliken at his home on October 10, 1993 and requested Ms. Dorsey's files and records. Mr. Milliken's law office had closed sometime in August or September, 1993. Originally, Mr. Milliken shared space in Suite 110A at 2901 Druid Park Drive with a cleaning service. He later moved to Suite 302 with George Davis and another attorney. Mr. Milliken told Reburn that his records and files were still at the Druid Park complex. Reburn advised him to retrieve them. Mr. Milliken never did so. Another AGC investigator wrote to Morris Iles, the CEO for the Druid Park office complex regarding Mr. Milliken's files. Iles's written response of May 13, 1994 advised that Mr. Milliken left five (5) boxes of papers and two (2) to four (4) file cabinets when he defaulted on his lease and vacated Suite 302. An additional sixteen (16) boxes of papers were removed from the offices and stored by the landlord. Mr. Milliken's files and papers were among those stored by the landlord in its general purpose storage.

"If fires had occurred there surely would be verification available from the City police, and/or fire departments or the landlord. This Court gave Milliken the opportunity to obtain and provide verification. Whether he chose not to, or could not do so because there is no such verification, the

result is the same. This Court finds his assertions utterly without support or credibility.

## II. Complaint of Thelma Lambert

"As a result of the Complaint filed by Thelma Lambert, an AGC investigation was initiated. Although Ms. Lambert was not present at the hearing before this Court, the excerpt of her testimony from the IPH was introduced without objection. The facts revealed by the investigation follow.

"Ms. Lambert wanted a deed prepared for her home. After seeing an advertisement in the paper for Maryland Paralegal Associates, Inc. ("MPA"), Ms. Lambert contacted Robert Morgan. Mr. Morgan is not an attorney. Mr. Morgan agreed to perform the desired services for her upon receipt of her check for the fee. The check was sent in May, 1993. Ms. Lambert then made numerous attempts to reach Mr. Morgan. Eventually, she received a call from Mr. Morgan who told her that he would take care of the matter.

"In July, 1993, Mr. Morgan visited Ms. Lambert's house with Mr. Milliken. Mr. Morgan asked Ms. Lambert in the presence of Mr. Milliken if there was any other work for him to do. Both Mr. Morgan and the Respondent gave Ms. Lambert their business cards. After promising to take care of the paperwork that day, Mr. Morgan and Mr. Milliken left the house. Mr. Morgan never completed the work, contacted Ms. Lambert, or refunded her money.

"On cross-examination, Ms. Lambert admitted that she did not expect anything from Mr. Milliken nor did he promise to do anything for her. After this contact, Ms. Lambert was unable to reach Mr. Morgan again even though he had cashed a $200 check from her. Mr. Milliken maintained that he had nothing to do with Ms. Lambert. He did not recall handing her his business card and stated that he was only there because he was getting a ride from Mr. Morgan. The Respondent testified that he went out-

side with Ms. Lambert's son while Mr. Morgan discussed business.

"Bar Counsel urges this Court find that Mr. Milliken violated Maryland Rule of Professional Conduct 5.5 by assisting a person not a member of the Bar with the unauthorized practice of law. Bar Counsel was unable to establish by clear and convincing evidence a relationship of the nature that would violate this rule. Ms. Lambert was unclear whether Mr. Morgan and Mr. Milliken were working together and Mr. Milliken stated that he was not involved in the case. In fact, on May 2, 1996, Bar Counsel admitted in closing argument that this was the most tenuous of the complaints and asked this Court to find that evidence showing a close working relationship between both men, the carrying of each other's business card, and Mr. Milliken's presence at the meeting with Ms. Lambert were enough to demonstrate the alleged misconduct. This Court declines such an invitation as Bar Counsel was unable to meet its burden of proof of clear and convincing evidence with respect to this Complaint. Since the client herself acknowledged at the IPH that she did not expect anything from Milliken and that he did not promise to do anything for her, this Court finds the evidence utterly insufficient in this instance.

### III. Complaint of Shannette Taylor–Hawkins

"Evidence was presented at the Circuit Court hearings on April 17 and 18, 1996 to establish the following facts regarding the above Complaint.

"On October 10, 1991, Ms. Taylor–Hawkins, the Complainant, and her daughter, Charise Nicole Colbert, were passengers in a taxicab that was involved in an accident. Initially, the Complainant hired attorney Nelson Kandel to represent her in a personal injury action. After fifteen months, Ms. Taylor–Hawkins discharged Kandel, and hired Mr. Milliken "to her knowledge."

"Ms. Taylor–Hawkins learned of Mr. Milliken from an acquaintance. During their initial telephone conversation,

Mr. Milliken told Ms. Taylor–Hawkins to pick up the file from Nelson Kandel's office and drop it off at MPA with his paralegal, Robert Morgan. Ms. Taylor–Hawkins believed the Respondent also maintained one of his offices at MPA. When she arrived there, she gave the file to Mr. Morgan. Mr. Milliken was not present. Subsequently, Ms. Taylor–Hawkins called MPA's office at St. Paul Street several times and spoke to Robert Morgan or his wife. She also tried to contact the Respondent at his office but always spoke with an individual named Ina. She found that the "462" number (Druid Park, the location of Mr. Milliken's office), was eventually disconnected. The only contact she had regarding her case was with Mr. Morgan with whom she met one time. He told her "they" were working on the file.

"Mr. Milliken explained that Ms. Taylor–Hawkins knew she could reach him through a mutual friend named Margo. He testified that his role was to determine whether she had a case. He determined that she did not, and he informed her of his conclusion by phone. He believed that to be a sufficient communication and therefore did not send any written correspondence. When asked for verification of his actions, Mr. Milliken stated that he had no files or records because "he did not record incidents of that nature." He testified that he did not maintain records because he never accepted money from her, and therefore, did not view her as a client.

"Finally, although Mr. Milliken testified that he made his relationship with MPA clear to her, Ms. Taylor–Hawkins did not understand the distinction between a lawyer and a paralegal. In the Answers to Requests for Admissions, the Respondent addressed Mr. Morgan's involvement with Ms. Taylor–Hawkins' file. Mr. Milliken admitted that he asked Mr. Morgan to "take a look into the file and see just what was in it and what would I need—what, if anything, I might need." Mr. Milliken stated that he took the file for his own review, but after deciding that he did not want the case, he returned it to Robert Morgan.

"Bar Counsel demonstrated through clear and convincing evidence that the Respondent violated several Maryland Rules of Professional Conduct in the course of his representation of Ms. Taylor–Hawkins. In this situation Mr. Milliken essentially left Ms. Taylor–Hawkins dangling. Though he did not understand that she was his client, from the moment that he agreed to review her case and directed her to deliver her file to his paralegal associate, Mr. Milliken was bound by the Maryland Rules of Professional Conduct in handling this matter. Although Mr. Milliken asserted that he did review the file and advised Ms. Taylor–Hawkins by phone that she had no case, he did not memorialize the conversation in any fashion. He did not notify her in writing. He did not make or keep a file of any kind. He did not even make any notes regarding his evaluation of the case or any conversation with her. Indeed, he attempted to justify the failure to make or maintain records on the rather astounding basis that because he never accepted money from her, he did not view her as a client. By contrast, Ms. Taylor–Hawkins was quite convincing in explaining that after their one (and only) telephone conversation, she never heard from Mr. Milliken again. He failed to return any of her numerous phone calls, and after his office phone was disconnected, he never provided her with information regarding how she could get in touch with him. Such inaction by Mr. Milliken clearly fails to comply with Rule 1.1 which requires a lawyer to provide competent representation and necessitates thoroughness and preparation reasonably necessary for the representation. Further, Mr. Milliken's inaction and inattentiveness, as noted above likewise fails to satisfy Rule 1.3 which obligates a lawyer to act with reasonable diligence and promptness in representing a client.

"By failing to contact, communicate with, or respond to his client's requests Mr. Milliken failed to comply with Rule 1.4(a). It obligated him to keep her reasonably informed about the status of the matter and promptly comply with reasonable requests for information. In startling contrast

to this important duty, Mr. Milliken did nothing to respond to, or communicate with his client.

"Rule 1.16(d) obligates a lawyer to surrender papers and property to which the client is entitled. Since the file that was obtained from Nelson Kandel and turned over to Robert Morgan at Mr. Milliken's direction for delivery to, and review by Mr. Milliken was somehow lost and never returned to Ms. Taylor–Hawkins after review by Mr. Milliken, he has also violated Rule 1.16(d).

"Finally, in the context presented, having directed the client to deliver her file to Robert Morgan to do some type of work, and subsequently directing Mr. Morgan to return the file to the client, Mr. Milliken had supervisory responsibility under Rule 5.3(b) over Mr. Morgan and his possession and disposition of the file. Mr. Milliken's responsibility to supervise the activities of such non-lawyer assistants obligated him to make reasonable efforts to ensure that Mr. Morgan's conduct was compatible with the lawyer's professional obligations in this case, including the responsibility to return the file or take other reasonable steps to make certain that the client knew what happened to the file. Ms. Taylor–Hawkins' file was never returned to her. Neither Mr. Milliken nor Mr. Morgan had any explanation for what happened to the file. Such shoulder shrugging hardly suffices to satisfy the mandate of Rule 5.3(b).

## IV. Complaint of Bar Counsel

"The Complaint filed by Bar Counsel in this matter concerns the Respondent's representation of Charles Clark in a Post Conviction proceeding before the Honorable Marvin Steinberg. The matter was first brought to the attention of Bar Counsel by Judge Steinberg after the Respondent missed two scheduled pre-hearing conferences.

"Mr. Milliken readily admitted that he misnoted the date of the original conference and failed to appear for a rescheduled conference because he had not checked his messages to learn of the new date. Mr. Milliken also admitted that he

did not respond to two letters from Bar Counsel relating to these events.

"The asserted "misnoting" of the first scheduled conference might be credible and even excusable as inadvertent clerical error if Respondent had not also, in connection with this same client matter, failed to appear for a subsequently rescheduled conference about which ample notice was given, or if he had responded, as required, to Bar Counsel's two letters relating to these events. Failing to check messages in the context presented can in no way suffice to justify the second failure to appear for a scheduled court conference. At a minimum both Judge Steinberg and his client had the right to expect Mr. Milliken's attendance, or to receive the courtesy of some reasonable notice or explanation for non-appearance if not reasonably before, then surely promptly after the fact(s) of his non-appearance. Mr. Milliken appears simply to have ignored the matters in the hope they would, as often colloquially expressed, "go away." Based upon Respondent's own admissions, this Court finds by clear and convincing evidence, that the Respondent violated Maryland Rules 1.3, 3.2, and 8.4(d). By failing to attend the conferences, it is clear that the Respondent did **not** "act with reasonable diligence and promptness in representing a client." In addition, Maryland Rule 3.2 requires that an attorney "make reasonable efforts to expedite litigation." Respondent's repeated absence from the conferences made compliance with this Rule impossible. These absences also indicate that the Respondent "engage[d] in conduct that [was] prejudicial to the administration of justice," which is prohibited by Maryland Rule 8.4(d).

"Lastly, Respondent's failure to respond to Bar Counsel's letters was in dereliction of his duty under Maryland Rule 8.1(b) which requires that Respondent "shall not ... knowingly fail to respond to a demand for information from an admissions or disciplinary authority...."

### V. Complaint of Bar Counsel

"The second Complaint filed by Bar Counsel concerns Mr. Milliken's handling of his attorney trust account from 1992–

1993. During the course of this investigation, several violations of the Maryland BU Rules, governing attorney trust accounts were discovered.

"The evidence introduced at the hearing consisted of Nations Bank statements (Exhibit 7), a summary "Review of Escrow Account Records" prepared by AGC Investigator John Reburn in April 1994 at the request of Assistant Bar Counsel Walter D. Murphy (Exhibit 8), a spreadsheet illustrating the monthly activity of the Respondent's attorney trust account for the period of January, 1987—September, 1993 (Exhibit 9) and 1992 Nations Bank statements (Exhibit 10).

"The evidence indicated that from 1986–1991, the activity related to Mr. Milliken's attorney trust account was in the normal range; there was nothing unusual about his method of disbursements. There was consistently a running balance at the end of each month of approximately $20,000 or more. However, in 1992, there was a significant change in the way the Respondent disbursed funds from the attorney trust account. Interestingly, this change in attorney trust account activity coincided with the Bank's unsatisfactory closeout of Mr. Milliken's general account in June, 1992 after three months of overdrafts.

"After Mr. Milliken's general account was closed, he regularly deposited funds into his attorney trust account and immediately wrote counterchecks payable to cash. He also issued regular escrow checks payable to cash. As a result, the funds in the attorney trust account dwindled significantly. Mr. Milliken began drawing down on the accumulated funds in the attorney trust account. All these transactions and balances are reflected in the exhibits introduced at the hearing.

"In addition to writing checks payable to "cash," the Respondent made cash disbursements to some of his clients from the trust account. He also stated that he would cash checks for clients as an accommodation because some of his clients did not have bank accounts. On August 4, 1992 Respondent received a check for $3,000.00 from the MTA in

settlement of a case he was handling for Theola Moore. He deposited the total amount into his escrow account, and then wrote and cashed a countercheck for $3,000.00 payable to cash. At the end of August Respondent received a check for $4,000.00 from Continental Loss Adjusting in settlement of a claim he was handling for Norma Williams. On September 15, 1992 he deposited the $4,000.00 check in his escrow account, and then wrote and cashed a countercheck for $4,000.00 payable to cash. On September 16, 1992, Respondent received a check for $2,250.00 from MAIF in settlement of a claim he was handling for Wylie Cator. On that same date he wrote and cashed a countercheck for the full amount payable to cash. An especially intriguing series of escrow account transactions by Mr. Milliken was evident in his handling of $6,000.00 in settlement funds which he received in connection with a case for his client, Sharon Stanley. On September 23, 1992 he deposited the $6,000.00 into his escrow account. On that same date he issued a check for two-thirds of that amount, i.e, $4.000.00 to his client. However, on September 24, 1992 he wrote a check from escrow for $1,500.00 to his wife, Ruth Milliken and a check for $500.00 payable to cash. Ruth Milliken was not Respondent's employee. Mr. Milliken explained that his wife handled the bills for their home and family and that in writing the $1,500.00 to her directly from escrow he was just taking "a short cut." He had no explanation as to what happened to or who received the $500.00 payable to cash.

"Mr. Milliken also accommodated corporate clients by keeping money in the trust account. He claimed that he was in-house counsel, although he was unable to provide any details as to what legal work he performed on behalf of the corporations.

"The Respondent testified that he neither put non-client funds into his escrow account, nor did he commingle his funds and other clients' funds. However, according to his testimony at the IPH, the Respondent acknowledged holding monies for people with whom he had a personal relationship rather than an attorney-client relationship. When

asked at the Circuit Court hearing to verify his relationship with these entities and his business with them, Mr. Milliken merely responded that he did "whatever legal matters came up." He produced no records or files, nor any corporate clients or other witnesses to substantiate any such corporate client relationships.

"Furthermore, the Respondent allowed fees to accumulate in the attorney trust account, and then drew on those fees in 1992–1993.

"Despite all of the above-mentioned activity, the Respondent has no records of any of these transactions, payments, fees, etc. He testified that the only records he kept were on a "simple pad," which was not produced at the hearing.

"The documentary evidence and Respondent's own admissions discussed above lead to the obvious and inescapable conclusion that Mr. Milliken did violate Rule BU9 by drawing instruments payable to cash on his attorney trust account. Making cash disbursements or writing counter-checks from the trust account is clearly prohibited. AGC Investigator Reburn's testimony concerning his review and analysis of Mr. Milliken's bank records demonstrated that for several years prior to 1992 Mr. Milliken allowed fee income to accumulate in his trust account in violation of Rule BU7.

"Further, by his own admission at the IPH, Mr. Milliken deposited and held funds for non-clients. Although he testified before this Court that such individuals and entities were clients, he produced none of these "clients" or other witnesses nor records of any kind to substantiate client relationships as to those individuals and entities. By allowing his own fees to accumulate in escrow and by holding non-clients' funds in escrow for extended periods with the funds of clients, and by not keeping those funds separate from the property of clients and third persons, he violated Rule 1.15(a) and BU7(a) which prohibit commingling of funds in a trust account.

"Maryland Rule BU9 prohibits an attorney from "borrow[ing] or pledg[ing] any funds required by these rules to

be deposited in an attorney trust account, ..., or us[ing] any funds for any unauthorized purpose." As previously discussed, Mr. Milliken wrote a check from the trust account directly to his wife for $1,500.00 for maintenance of their household, he wrote checks for cash, and cashed checks from his attorney trust account. The funds that he removed from the account or neglected to place in the account were appropriately attorney trust account funds and therefore, the Respondent was unauthorized to use the funds in the manner listed above.

"The Respondent also had a duty under Maryland Rule 1.15(a) to keep "complete records of such accounts ... [to be] preserved for a period of five years after termination of the representation." By Respondent's own admission, he kept no records. In light of his consistent and repeated use of counterchecks and instruments payable to cash, Mr. Milliken's failure to produce any records himself regarding the trust account is hardly surprising. Keeping track and accounting would be difficult, if not impossible, without some concomitant system of record-keeping correlating such instruments with particular clients, cases, or transactions.

## VI. Complaint of Gorman Murphy

"Mr. Gorman Murphy was not present at the hearings before this Court. Neither were Ms. Rosaleen Brewer or Ms. Pauleen Williams. However, both women testified before the Inquiry Panel in April and May, 1995. Mr. Murphy never testified. The facts related to this Complaint were established as follows.

"Mr. Murphy and his two sisters, Ms. Brewer and Ms. Williams, went to Mr. Milliken's office for his assistance in preparing a deed that would convey Mr. Murphy's property to his grandsons. Although Mr. Murphy said very little during the meeting because of his ill health, it was agreed that the Respondent would prepare both a will and a deed. The will was to be sent to Mr. Murphy's house and the deed was to be delivered to the sisters' house. The Respondent testified that he fully explained to the sisters the necessary

steps to execute the will and the deed properly, and how to take the deed to the land records office and have it recorded and pay the necessary property tax.

"Mr. Milliken stated that the sisters were unhappy with the completed deed because they wanted the house to be deeded to them and apparently decided that if the property was not deeded to them, they did not want the work done. Mr. Milliken testified that he told the sisters he could not do as they wished because it was contrary to the wishes of his client, Mr. Murphy, who was allegedly satisfied with the work.

"At the hearing, Bar Counsel introduced a copy of a letter to Mr. Milliken signed by Mr. Murphy, Ms. Brewer, and Ms. Williams. The letter, dated August 1, 1993, indicated that they expected Mr. Milliken to record the deed and send it back to them and, if this was not possible, they expected the return of their money. At that time, the Respondent had not contacted the Complainants for approximately one year since their first meeting. Ms. Brewer and Ms. Williams were unable to contact the Respondent. He never recorded the deed and they never received a refund.

"The Respondent maintained that he did everything they requested of him and more because he gave them a will in addition to the deed. Mr. Milliken was unable to support his contentions as he produced no documents to support his position. Instead, he claims that all relevant documents were destroyed in the alleged office fires.

"In light of the facts established by clear and convincing evidence at the hearing, this Court concludes that Mr. Milliken violated Maryland Rules 1.1, 1.3, 1.4(a), (b), and 8.1(b). His failure to record the deed or provide adequate instructions for the Complainants, his dereliction in failing to contact his clients either before or after they wrote him the letter, and his non-existent documentation of work alleg-edly performed demonstrate that he acted incompetently and without diligence. Further, he did not keep his client "reasonably informed about the status of his legal matter and promptly comply with reasonable requests for informa-

tion ... or explain [the] matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

"In addition, as admitted by the Respondent in Exhibit 2, it is clear that he violated Maryland Rule 8.1 by failing "to respond to a lawful demand for information," in that he refused to answer letters from Bar Counsel regarding the Complaint of Gorman Murphy.

### VII.   Complaint of Patricia Carmichael

"Based upon allegations set forth in this Complaint as well as testimony elicited from the Respondent at an IPH on May 3, 1994, an investigation into Mr. Milliken's representation of Patricia Carmichael took place.   The following facts were established.

"Patricia Carmichael testified under oath before the IPH by telephone from a federal correctional facility in California on April 20, 1995 (Exhibit 13) and on May 23, 1995 (Exhibit 14).   She was introduced to Mr. Milliken by Mr. Morgan. Mr. Milliken visited her with Morgan one time at the Montgomery County Detention Center.   He agreed to represent her on her three (3) pending state matters for an agreed fee of $1,500.00. The three matters involved a Parole Violation, and two (2) state matters involving theft charges. Ms. Carmichael's mother, Iva Andrew, sent the $1,500.00 to Mr. Morgan.   Mr. Morgan gave Mr. Milliken $1,500.00. Mr. Milliken in turn gave him back $500.00 for Morgan's services in working on Ms. Carmichael's legal problems. After the initial meeting at the Montgomery County Detention Center Ms. Carmichael never heard from Mr. Milliken again.   He did not effect the desired *nolle prosequi* on the state charges, nor did he assist in bringing about the lifting of the Maryland detainers.   The state matters were ultimately resolved with the assistance of Colleen Beach, a legal intern at Legal Aid at Lexington, Kentucky.

"Although the Respondent denied in testimony before this court that he ever represented Ms. Carmichael, his testimony before the Inquiry Panel on May 3, 1994 indicates

otherwise. In fact, before the Inquiry Panel at a time before Ms. Carmichael had filed a Complaint with the AGC, the Respondent testified that he was hired to negotiate with a State's Attorney to nolle pros Ms. Carmichael's shoplifting charge in order for her to avoid serving substantial federal time. He specifically stated that, "that's what I was hired for and that's what I dealt with."

"Before this Court, Mr. Milliken testified that he spoke with Ms. Carmichael at the Baltimore City or Baltimore County Detention Center and told her that he would handle her State case for $1500.00. He testified that he made it clear that he would not do any work until he was paid in full and then he gave Ms. Carmichael his name, address, telephone number, paper and a pen, and told her to have a relative get in touch with him about the fee. Mr. Milliken stated that he never again heard from Ms. Carmichael.

"Two letters, allegedly signed by the Respondent, and on his office letterhead, were introduced into evidence before this Court. One letter was addressed to Ms. Carmichael and confirmed that Mr. Milliken had been retained, having received the necessary funds, and that he would visit her within a week. The second letter was addressed to the Warden of the Montgomery County Detention Center indicating that the Respondent was Ms. Carmichael's attorney and he intended to visit his client. The Respondent denied writing the letters, and suggested that Mr. Morgan may have used the Respondent's letterhead and forged the Respondent's signature.

"Mr. Morgan appeared before this Court on May 2, 1996, and confirmed that he arranged the meeting between Ms. Carmichael and Mr. Milliken and Mr. Milliken returned $500.00 to Mr. Morgan for services rendered.

"The testimony of Ms. Carmichael before the IPH, the testimony of Mr. Morgan before the IPH and before this Court, as well as that of Mr. Milliken before both the IPH and this Court are essentially consistent with respect to Mr. Morgan introducing Mr. Milliken to Ms. Carmichael, arranging their meeting, the nature of the work to be per-

formed and the amount of the fee. At a time before Ms. Carmichael had actually filed a Complaint, Mr. Milliken readily, repeatedly and in great detail admitted that he was hired by Ms. Carmichael to deal with her state matters. His subsequent denial before this Court years after such admissions and at a time after Ms. Carmichael's complaint was filed and pursued by the AGC, renders Mr. Milliken's former rather than latter testimony credible. This Court further finds that Ms. Carmichael's testimony that Mr. Milliken never did any work in her cases was, however, in some sense at least corroborated by Mr. Milliken's later position in testimony before this Court in that he acknowledged that he never did any work. His justification, i.e., never having received any money from her, is what is not credible. This Court's conclusion is further bolstered by the fact that once again Mr. Milliken produced no record, files or documentation of any kind to support any of his testimony at any time.

"By failing to undertake any work in this case Mr. Milliken has violated his obligation under Rule 1.3 to act with diligence in representing this client. By not communicating with her, or responding to her or her family's messages and requests for contact he has violated Rule 1.4(a) which governs his obligation to communicate with his client and to comply with reasonable requests for information. Having failed to do any work whatsoever for Ms. Carmichael his fee of $1,500.00 can hardly be said to have been reasonable as required by Rule 1.5(a). Further under Rule 1.5(b) Mr. Milliken was obligated to communicate, preferably in writing, the basis or rate of his fee to Ms. Carmichael, who had not regularly been represented by Mr. Milliken. In this instance there was never any communication of any kind concerning the basis of his fee.

"The evidence in this matter further satisfies this Court that Mr. Milliken violated Rule 5.4 by sharing legal fees with a non-lawyer. Mr. Morgan got the $1,500.00 fee from Ms. Carmichael's family, gave it all to Mr. Milliken, who immediately gave $500.00 back to Mr. Morgan.

"By requesting a fee, receiving it in full, and then failing to do any work whatsoever Mr. Milliken's conduct and actions were dishonest, deceitful and fraudulent. They constitute not only misconduct, but indeed the very kind of misconduct which is also prejudicial to the administration of justice under Rule 8.4.

"Finally, in this as in several other instances, Mr. Milliken by his own admissions failed to respond to a lawful demand for information by Bar Counsel concerning this Complaint in violation of Rule 8.1(b).

### VIII. Complaint of Carroll Middleton

"In connection with this Complaint, the following facts were established by clear and convincing evidence at the hearings before this Court in April and May, 1996.

"This Complainant was introduced to the Respondent in the spring or summer of 1994 by Marian Turner, a mutual acquaintance. The Respondent met with Mr. Middleton at Ms. Turner's house. The purpose of the meeting was to discuss whether Mr. Milliken would review and evaluate a prior lawsuit in which Mr. Middleton was a party. The Respondent suggested at their meeting that Mr. Middleton's prior lawyer had not pursued the case in Mr. Middleton's best interest, and that Mr. Middleton had a potential lawsuit against that lawyer. Mr. Milliken agreed to review the file and think about how to pursue the case.

"After conferring with Mr. Morgan, who was also present, Mr. Milliken said his fee was $350.00 and asked Mr. Middleton to make the check out to Mr. Morgan, who Mr. Middleton understood was not an attorney. Mr. Middleton stated that he was never really sure what basis there was for the fee. The fee was never placed in an attorney trust account.

"At the request of Mr. Milliken, Mr. Middleton produced all of his files and documents. However, when Mr. Middleton tried to contact Mr. Milliken, he was unsuccessful. Mr. Middleton left several messages, but it took more than six months for Mr. Milliken to respond. When Mr. Milliken did

respond, he agreed to return $250.00 and the files. However, Mr. Middleton received nothing from the Respondent.

"Mr. Milliken stated that he reviewed the files and sent an opinion letter, which he was unable to produce at the hearing because it was destroyed in the alleged fire. The Respondent had no documents, files, correspondence, or retainer agreements to evidence any work.

"Bar Counsel has established by clear and convincing evidence that the Respondent met with Mr. Middleton, agreed to perform legal services for him, collected a fee, cashed the check prior to performing any services, and then made himself unavailable to Mr. Middleton. Mr. Milliken ultimately promised to refund money to this client, but never did.

"Based on the Respondent's failure to communicate with Mr. Middleton after receiving his file and his negligence in acting to apprise Mr. Middleton regarding his case, this Court concludes that Mr. Milliken violated Maryland Rules 1.3 and 1.4(a) requiring him to act with diligence and to keep his client reasonably informed.

"By failing to perform any work on Mr. Middleton's behalf and charging a fee, the basis of which was not explained to the client, the Respondent violated Maryland Rule 1.5(a), (b) which obligates a lawyer to charge reasonable fees consistent with the amount of effort made on a client's behalf and to communicate the basis of the fee to the client. Here, Mr. Milliken charged $350.00 and did nothing. In addition, Mr. Milliken neglected to return Mr. Middleton's files and the fee which he did not earn. These actions are violative of Maryland Rule 1.16 which requires an attorney to "surrender[ ] papers and property to which the client is entitled and refund[ ] any advance payment of fee that has not been earned."

"Finally, as admitted by the Respondent in Petitioner's Exhibit 2, it is clear that he violated Maryland Rule 8.1(b) by failing "to respond to a lawful demand for information," in that he refused to answer letters from Bar Counsel regarding the above Complaint.

## IX. Complaint of Olivia Cornish

"Evidence and testimony were presented at trial to establish the following facts relating to this Complaint.

"This Complaint resulted from Mr. Milliken's representation of William Cornish, an individual who was a fugitive from the law at the time he sought legal assistance. Federal charges were pending against Mr. Cornish, his co-defendant had been apprehended, and was in the last phase of his trial. Mr. Cornish allegedly asked the Respondent to monitor the trial to find out the outcome and to determine whether there was evidence incriminating Mr. Cornish.

"Mr. Milliken approached Ms. Cornish several times for money and actually received seven cash payments totaling $5,000.00 from Ms. Cornish on behalf of her son. Mr. Milliken testified that he told Ms. Cornish exactly how much to pay him for each service. Randolph Cornish, the client's brother, testified that Mr. Milliken was told by Ms. Cornish to communicate through Randolph regarding the case and the fees, but that the Respondent continued to demand the money from Ms. Cornish and never contacted Randolph.

"Ms. Cornish stated that she was nervous about the lack of progress. She noticed that the Respondent never gave progress reports. Furthermore, although the Respondent testified that he met with detectives and the federal prosecutor, consulted with Mr. Cornish's girlfriend and did research, he produced no evidence of any kind at the hearing to substantiate such assertions. He had no accounting of time spent on the Cornish matters. He testified that he did take notes on research but did not keep them, nor did the Respondent keep notes regarding the alleged visits to the District Court to see if a warrant was outstanding for Mr. Cornish. Respondent explained that he did not feel the records were necessary.

"It is unclear from the evidence presented at the hearing precisely what Mr. Milliken's responsibilities entailed because it seems that Mr. Cornish was the only person who spoke to the Respondent about the scope of his representa-

tion. In fact, Ms. Cornish testified that she was called to the Grand Jury and expected to see Mr. Milliken there because she thought he was her lawyer. He did not appear. The Respondent indicated during his cross-examination of Ms. Cornish that the above responsibilities, i.e. meeting with the federal prosecutors and detectives, etc., were his function as Mr. Cornish's attorney. The Respondent also testified that he attempted to update Ms. Cornish but she admittedly did not want to hear the details.

"Mr. Milliken stated that he had several conversations with the federal prosecutor to see if he could get a deal for Mr. Cornish. Both Ms. Cornish and her son, Randolph, believed that Mr. Milliken was hired to work out a plea with the federal prosecutor. Testimony indicates that there was some understanding that Mr. Milliken was to monitor a federal trial and engage in plea negotiations with the federal prosecutor. However, Mr. Milliken is not a member of the Federal Bar. Mr. Milliken indicated that he knew he couldn't represent Mr. Cornish in federal court, but he thought he could do the work leading up to the court date and suggested that Mr. Cornish could represent himself.

"Ultimately when William was caught and put in prison, Mr. Milliken was nowhere to be found. Ms. Cornish was forced to hire another attorney to represent her son because she never heard from Mr. Milliken again, nor did she know how to contact him.

"Subsequently, Ms. Cornish filed a suit against the Respondent and was awarded a civil judgment for $5000.00 by default. Respondent stated that he did not contest the suit because "the time just got away from [him]." Mr. Milliken neither paid nor appealed the judgment. He testified that he did not pay it because he "didn't feel she [was] entitled to it."

"The facts established by clear and convincing evidence at the trial support a conclusion by this Court that Mr. Milliken violated Maryland Rule 1.16(d). There is absolutely no credible evidence to show that Mr. Milliken performed any work on behalf of Mr. Cornish and he never refunded the

money Ms. Cornish was entitled to receive as a "fee that had not been earned." Having accepted fees to work out a plea agreement in a Court before which he was not admitted to practice, doing no work and failing to be present at any hearings directly involving his client, Mr. Milliken also violated Maryland Rule 8.4(d) which deems it to be professional misconduct when a lawyer "engage[s] in conduct that is prejudicial to the administration of justice." Similarly, as a lawyer who has failed to pay a judgment, which he neither contested nor appealed, because he doesn't feel that Ms. Cornish is entitled to the money, he has in this Court's view engaged in conduct prejudicial to the administration of justice.

"Finally, as admitted by the Respondent in Petitioner's Exhibit 4, it is clear that he violated Maryland Rule 8.1(b) by failing "to respond to a lawful demand for information," in that he refused to answer letters from Bar Counsel regarding the above Complaint.

## X. Complaint of Tyrese Alexander

"The facts established before this Court demonstrated that the Respondent agreed to represent a Ms. Alexander, accepted payment for services to be performed, and never fulfilled his responsibilities.

"In this case, Ms. Alexander approached Mr. Milliken for assistance in an uncontested divorce and was quoted a fee of $350.00. Mr. Milliken did not explain the basis of the fee to Ms. Alexander. She paid a $200.00 retainer fee on the date of their initial meeting in March, 1991. She tried unsuccessfully to reach him by phone on numerous occasions, but got no response for months. Five months after reaching Mr. Milliken, Ms. Alexander recalled getting a two page Bill of Complaint for Absolute Divorce in August, 1991. There was no cover letter and no instructions as to how she should proceed. Mr. Milliken testified that he previously instructed her, but he cannot produce evidence of his work.

"Subsequently, Ms. Alexander attempted to call the Respondent several times without success. Finally, on Decem-

ber 24, 1993, Mr. Milliken contacted Ms. Alexander and requested that she give him until January 1, 1994 to refund her money. Ms. Alexander never heard from the Respondent again, nor did she receive a refund.

"Based upon the facts established by clear and convincing evidence, this Court concludes that the Respondent has violated Maryland Rules 1.3 and 1.4(a) by failing to act with diligence and to communicate with Ms. Alexander and keep her "reasonably informed." As noted above, Mr. Milliken provided no letter of explanation with the Complaint he sent, nor did he return her many phone calls. More than two (2) years passed without any further work by Mr. Milliken or communication with this client. By charging Ms. Alexander a fee, doing minimal work, and failing to explain the basis for the charge, Mr. Milliken violated Maryland Rule 1.5(b) which obligates a lawyer to charge reasonable fees consistent with the amount of effort made on a client's behalf and to communicate the basis of his fee to the client within a reasonable amount of time.

"Although Mr. Milliken told Ms. Alexander he would return her money, he did not do so and therefore he is in violation of Maryland Rule 1.16(d) which mandates that a lawyer "refund[ ] any advance payment of fee that he has not earned."

"Finally, as admitted by the Respondent in Petitioner's Exhibit 4, it is clear that he violated Maryland Rule 8.1(b) by failing "to respond to a lawful demand for information," in that he refused to answer letters from Bar Counsel regarding the above Complaint."

(Footnotes omitted).

The hearing judge found by clear and convincing evidence that Milliken violated the following Rules of Professional Conduct: 1.1 (Competence); 1.3 (Diligence); 1.4(a), (b) (Communication); 1.15(a), (b) (Safekeeping Property); 1.16(d) (Declining or Terminating Representation); 3.2 (Expediting Litigation); 5.3(b) (Responsibilities Regarding Non-lawyer Assistants); 5.4(a) (Professional Independence of a

Lawyer); 8.1(b) (Bar Admission and Disciplinary Matters); 8.4 (Misconduct), and Maryland Rules BU7 (Commingling of Funds) and BU9 (Prohibited Transactions). Neither Bar Counsel nor Respondent has filed exceptions to these findings of fact and conclusions of law.

The sole issue before this Court is the extent of the discipline to be imposed upon Respondent. This Court is vested with the responsibility to supervise the conduct of lawyers in order to protect the public and to maintain public confidence in the judicial system and the bar as a whole. The purpose of sanctions is not to punish the errant lawyer, but rather to protect the public from further acts of misconduct, to protect the integrity of the legal profession and to deter other lawyers from engaging in violations of the Rules of Professional Conduct. *Attorney Griev. Com'n v. Myers* 333 Md. 440, 447, 635 A.2d 1315, 1318 (1994). Each case is to be judged based on the particular facts and circumstances. *Attorney Griev. Comm'n v. Babbitt,* 300 Md. 637, 642, 479 A.2d 1372, 1375 (1984). Bar Counsel recommends disbarment as the appropriate sanction in this case. Respondent urges this Court to consider some lesser sanction other than disbarment, such as suspension. For the following reasons, we conclude that the appropriate sanction is disbarment.

The hearing judge found that Respondent engaged in egregious misconduct that amounted to "fraud, deceit and misrepresentation." His clients suffered severe detriment. He repeatedly neglected client matters and failed to take steps to protect client interests. Respondent repeatedly failed to apprise clients honestly of the status of their cases, and in effect, repeatedly lied to his clients. In failing to provide proper representation, he misled his clients into believing that their matters were being appropriately handled. He did not refund advance payment of fees that had not been earned and, on more than one occasion, he shared fees with a non-lawyer. When sued by a client for the return of the unearned fee, he did not appear in court, and subsequently ignored the default judgment simply because he felt the judgment was unwarrant-

ed. Respondent violated Maryland Rules BU7 and BU9 by drawing instruments payable to cash on his attorney trust account, by making cash disbursements from his trust account, and by allowing fee income to accumulate in his attorney trust account. He deposited and held funds for non-clients in his trust account, thereby commingling client funds with personal and non-client funds. In writing checks from the trust account directly to his wife, he used trust funds for unauthorized purposes. He also failed to keep complete records of his trust account. In addition to his pattern of misconduct and neglect of client matters, Respondent failed to cooperate with Bar Counsel. He repeatedly refused to answer Bar Counsel's letters.

■ In each of the matters before the Court, Respondent received fees from the client for work to be performed in the future.[14] As an advance fee payment, he was obligated to return any unearned portion of the fee under Rule 1.16(d). *See Attorney Griev. Com'n v. David,* 331 Md. 317, 323, 628

---

**14.** This Court has not previously addressed the question of whether advance payment fees must be placed in a trust account, or whether they are funds which may be placed in the operating account. *But Cf. Attorney Griev. Comm. v. Hallmon,* 343 Md. 390, 409, 681 A.2d 510, 519–20 (1996). Most courts that have considered the issue have determined that advance payment fees must be placed in the trust account. *See Louisiana State Bar Ass'n v. Tucker,* 560 So.2d 435, 440 (La.1989). For example, in *Louisiana State Bar Ass'n v. Williams,* 512 So.2d 404, 409 (La.1987), the Supreme Court of Louisiana held that "an advanced fee for particular services not yet performed constitutes funds of the client which should be placed in a trust account and not withdrawn or withheld without the consent of the client." *See also The Advance Fee Payment Dilemma,* 10 CARDOZO L.REV. 647, 649 (1989); CHARLES W. WOLFRAM, MODERN LEGAL ETHICS § 9.2.2, at 506 (1986) (advance fee payment must be treated as client trust funds subject to the special rules for safeguarding them).

It is beyond question, however, that under Rule 1.16(d), any portion of an advance payment fee that is unearned must be returned to the client. In the case before us, there is no dispute as to whether the fees Milliken received were advance payment for work to be done in the future. The only issue before the hearing court was whether Milliken had earned the full fee. The hearing judge found that the fees were unearned and should have been returned to the clients. Moreover, the judgment in the Cornish case, which Milliken did not appeal, is further evidence that Milliken failed to return unearned fees.

A.2d 178, 181 (1993) (sanctioning attorney in part for his failure to return a fee which was unearned); *Attorney Griev. Com'n v. Hill,* 314 Md. 293, 294, 550 A.2d 707, 707 (1988) (ordering attorney to show cause why he should not be suspended for refusal to return the fees to two clients for whom he took no action); *Attorney Griev. Com'n v. Bloom,* 306 Md. 609, 610, 510 A.2d 589, 589 (1986) (disbarring attorney, in part, for conversion of client funds in failing to refund a retainer after attorney took no action on client's case); *Attorney Griev. Com'n v. Harper,* 300 Md. 193, 198, 477 A.2d 756, 758 (1984) (disbarring attorney, in part, for misappropriation of funds in failing to return monies client paid attorney); CHARLES W. WOLFRAM, MODERN LEGAL ETHICS § 9.2.2, at 506 (1986). Milliken has never returned the unearned portion of the fees to the clients. In *Attorney Griev. Comm'n v. Manning,* 318 Md. 697, 704–05, 569 A.2d 1250, 1254 (1990), we noted:

> In recent years, however, we have noticed too many instances when lawyers have agreed to represent clients and accepted fees, in part or in whole, only to completely neglect these same legal problems, causing the same clients emotional distress, financial loss, or other varying kinds of inconvenience. More often than not, these situations have been exacerbated by the lack of respect and attention extended to the courts as evidenced by the failure to file timely pleadings or to make appearances as scheduled before the court to enable proceedings to be conducted. It seems to us that this kind of persistent conduct is evidence of a lawyer's disregard of his obligation.

As in *Manning,* the instant case is a clear example of such an attitude. The hearing judge found that "[b]y requesting a fee, receiving it in full, and then failing to do any work whatsoever Mr. Milliken's conduct and actions were dishonest, deceitful and fraudulent. They constitute not only misconduct, but indeed the very kind of misconduct which is also prejudicial to the administration of justice." The hearing judge found that Respondent told clients Steward (Dorsey), Middleton, and

Alexander that he would refund the legal fee, but he failed to do so.

It is well settled that the extent of discipline to be applied is dependent upon the severity of the attorney's misconduct and the particular facts of the case. *Attorney Griev. Comm'n v. Montgomery,* 318 Md. 154, 165, 567 A.2d 112, 117 (1989). The gravity of misconduct is not measured solely by the number of rules broken but is determined largely by the lawyer's conduct. *Flint's Case,* 133 N.H. 685, 582 A.2d 291, 293 (1990). This case involves the most serious of professional and ethical duties arising from the attorney-client relationship. Respondent's treatment of his trust account in violation of Rules BU7 and BU9 alone warrants disbarment. As we have repeatedly said, commingling and conversion of client funds, in the absence of mitigating circumstances, ordinarily warrants disbarment. *Myers,* 333 Md. at 449, 635 A.2d at 1319; *Attorney Griev. Comm'n v. White,* 328 Md. 412, 417, 614 A.2d 955, 958 (1992); *Attorney Griev. Comm'n v. Bakas,* 323 Md. 395, 403, 593 A.2d 1087, 1091 (1991); *Attorney Griev. Comm'n v. Lazerow,* 320 Md. 507, 513, 578 A.2d 779, 782 (1990); *Attorney Griev. Comm'n v. Ezrin,* 312 Md. 603, 608–09, 541 A.2d 966, 968 (1988). Respondent has never returned the money he owes to his clients, even in the face of a judgment for the amount of the unearned fee. Respondent's pattern of neglect of client affairs, resulting in serious harm to his clients, and his failure to return unearned fees, undermine the "very underpinnings of the practice of law, which are honesty toward his clients and loyal advocacy on their behalf." *Flint's Case,* 582 A.2d at 293.

As an attorney licensed to practice law in the State of Maryland, Respondent has submitted to the exclusive disciplinary jurisdiction of this Court. The refusal of an attorney to respond to a demand by the disciplinary authority is sanctionable conduct under Rule 8.1(b). *Attorney Griev. Comm. v. Hallmon,* 343 Md. 390, 408, 681 A.2d 510, 519 (1996). Respondent's failure to respond to Bar Counsel's letters in any manner evidences his disrespect for the attorney disciplin-

ary process in this State. His total disregard for the judgment entered against him on behalf of Ms. Cornish evidences his lack of concern for the administration of justice.

The violations in this case are serious and reveal in Respondent the absence of fundamental requirements of a lawyer: honesty, integrity, and respect for the legal system. Writing for the Court in *Maryland St. Bar Ass'n. v. Phoebus*, 276 Md. 353, 366, 347 A.2d 556, 563 (1975), Judge O'Donnell observed:

> As we see it, the interests of the public mandate his disbarment; indeed, to order otherwise, would constitute an abnegation of our responsibilities, and would convey to the public, implicitly, a misrepresentation that the respondent continues to possess the basic attributes, required of all members of the bar, that they will act with proper care in representing their clients and will, with strictest fidelity, diligently attend their clients' interests. On the part of the respondent these attributes are convincingly found to be utterly wanting.

The record in the instant matter shows numerous trust account violations, a continuing pattern of neglect of client affairs, conversion of client monies in failing to return unearned fees, and contempt for the disciplinary process. The gravity of Respondent's conduct is further aggravated by the fact that the Court rejected as totally incredible Respondent's explanation that his failure to maintain records relating to his trust account as well as client matters was due to an office fire. *See Bar Ass'n v. Marshall*, 269 Md. 510, 520, 307 A.2d 677, 682 (1973). As in *Phoebus*, to protect the public, to instill confidence in the legal profession, and to deter similar behavior, disbarment is mandated. *Myers*, 333 Md. at 446–47, 635 A.2d at 1318. Accordingly, the name of Herschel D. Milliken will be stricken from the rolls of those authorized to practice law in this State.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15(c), FOR WHICH SUM*

*JUDGMENT IS ENTERED IN FAVOR OF THE ATTOR-NEY GRIEVANCE COMMISSION AGAINST HERSCHEL D. MILLIKEN.*